UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE SOCIETY OF LLOYD'S,<br>*Plaintiff*<br><br>Vs.<br><br>BRUCE G. SUNDLUN,<br>*Defendant* | :<br>:<br>:<br>:<br>:<br>:<br>: | C.A. No. 06-106T |

## DECLARATION OF NICHOLAS DEMERY

1. My name is Nicholas Demery. I am a solicitor employed by the Society of Lloyd's ("Lloyd's") in the litigation section of the Legal & Compliance Department. I have personal knowledge of the facts stated in this Declaration and they are true and correct. My knowledge about the history and structure of Lloyd's has been acquired in the course of my employment at Lloyd's. I am over the age of 18 years.

2. Lloyd's is the regulator of an English insurance market located in London, England. The United Kingdom Parliament, through a succession of Parliamentary Acts, the Lloyd's Acts 1871-1982, has authorised Lloyd's to regulate those who conduct insurance business in the Lloyd's market.

3. Lloyd's regulatory responsibilities are currently vested in, and must be carried out by, the Council of Lloyd's. Lloyd's Act 1982 Section 6(1). Among its regulatory responsibilities, Lloyd's promulgates and enforces regulations in accordance with its powers and obligations under the Lloyd's Acts, and exercises disciplinary authority over persons in the Lloyd's market. As with any insurance regulator, one of the fundamental objectives of Lloyd's regulatory regime is to ensure that policyholders are paid in respect of valid claims.

4. Lloyd's is not an insurer and does not insure risks. The only insurers in the Lloyd's market are underwriting members of Lloyd's, who are known as Names. The U.K. Insurance Companies Act 1982 (now the Financial Services & Markets Act 2000) permits members of Lloyd's or "Names" to lawfully conduct insurance business only as long as they

become, and remain, subject to Lloyd's regulatory jurisdiction. Thus, membership in Lloyd's and compliance with Lloyd's regulations and requirements is a license lawfully to conduct insurance business in the United Kingdom directly with policyholders in respect of insurance risks assumed independently by Names.

5. Bruce G. Sundlun ("Sundlun") was elected a member of Lloyd's on January 1, 1979. As a condition of his membership and continuing membership of Lloyd's, Sundlun entered into certain agreements governing his membership of and underwriting in the Lloyd's market. One of the agreements that Sundlun executed was the General Undertaking. A copy of the General Undertaking signed by Sundlun is attached as *Exhibit 1*.

6. Sundlun ceased to underwrite at Lloyd's on January 1, 1993.

7. In the General Undertaking, Sundlun agreed, among other things, that: (a) he would comply with the provisions of the Lloyd's Acts 1871-1982 and any byelaws, regulations, etc. duly promulgated thereunder in connection with his membership of and underwriting at Lloyd's; (b) any dispute arising out of or relating to his membership of, and/or underwriting of insurance business at, Lloyd's would be resolved in English courts pursuant to English law; and(c) a judgment in any Proceedings brought in the English courts may be enforced in the courts of any other jurisdiction.

8. Sundlun incurred liabilities on insurance commitments he undertook in the Lloyd's market as a Name. Names (each having several liability for their individual risks assumed) provide insurance through groups of Names called syndicates. In order to close the syndicate at the end of each underwriting year of account, reinsurance is purchased to cover any outstanding liabilities as well as liabilities that have been incurred but not at that time reported. Throughout his membership of Lloyd's, Sundlun was required to pay for reinsurance of his liabilities arranged for him by his Managing Agent.

9. In the late 1980s and early 1990s, Names in the Lloyd's market incurred aggregate underwriting losses of £ 8 billion (over $12 billion). Much of this was as a result of massive liability for pollution and asbestos-related injuries, as well as a series of natural disasters. Many

Names underwriting in those years found they were unable to purchase affordable or any reinsurance and so faced open-ended liabilities. At the same time, a significant amount of intra-market litigation began to embroil the Lloyd's market. This litigation did not primarily involve Lloyd's but rather a series of claims by Names against their Members' and/or Managing Agents for negligent underwriting, and against auditors, for which substantial damages were awarded by English courts in favour of the Names.

10. In order to resolve these issues -- which threatened the continued viability of the Lloyd's market and placed policyholders who had paid premiums to Names at risk of non-payment in respect of valid claims -- Lloyd's devised the reconstruction and renewal ("R&R") plan. The R&R plan had two separate components: (1) an offer of settlement was made to each Name with liabilities on 1992 and prior underwriting years of account to end litigation and to assist them to meet these liabilities, and (2) the provision of reinsurance otherwise unavailable to each Name in respect of his or her underwriting obligations on 1992 and prior underwriting years of account through a newly-formed company, Equitas Reinsurance Ltd. ("Equitas"). The R&R plan mandatorily effected reinsurance to close for each Name into Equitas, and required each Name to pay their individual costs of reinsurance by payment of a premium to Equitas (the "Equitas premium"), regardless of whether the Name accepted or rejected the settlement offer.

11. The closing date for accepting the settlement offer was September 11, 1996, although Lloyd's had the discretion to allow acceptances up to February 28, 1997. The implementation of the R&R plan was held by English courts to be within Lloyd's regulatory authority. *R v. The Council of the Society of Lloyd's ex parte Susan Rachel Johnson* (16 August 1996). *Society of Lloyd's v. Leighs, Lyon and Wilkinson* (Court of Appeal 31 July 1997).

12. Sundlun did not accept the settlement offer.

13. Pursuant to the powers conferred upon it by the Lloyd's Acts, Lloyd's enacted the Substitute Agents Byelaw on July 10, 1983. The Substitute Agents Byelaw, as amended, is attached as *Exhibit 2*. Under the Substitute Agents Byelaw, Lloyd's had the power to appoint

Substitute Agents to act on behalf of Names at the discretion of the Council of Lloyd's (the ruling body of Lloyd's).

14. In September 1996, the Council of Lloyd's issued the Resolution and Directions, which is attached as *Exhibit 3*. By virtue of this resolution, Lloyd's appointed Additional Underwriting Agencies (No. 9) Limited ("AUA9") as the Substitute Agent on behalf of the Names, including Sundlun, with the authority "to execute the Reinsurance Contract for itself and on behalf of the Members in such form as the Council may direct and to undertake all obligations of the Substitute Agent under the Reinsurance Contract....and to perform all functions necessary therefore or incidental thereto."

15. AUA9 signed the Equitas reinsurance contract on behalf of all Names. A copy of certain pages of the reinsurance contract is attached as *Exhibit 4* (the entire document is more than 130 pages long). When the R&R plan became effective on September 3, 1996, Sundlun (as was the case with all other Names with 1992 and prior liabilities) became obligated to make payment of the Equitas premium by September 30, 1996. Approximately 95 percent of Names accepted the settlement offer component of R&R and paid their liabilities under the terms of the settlements.

16. Sundlun did not satisfy his respective obligations in the amount claimed, or at all.

17. For reasons of regulatory prudence and to ensure immediate funding for Equitas that was necessary for Equitas to meet regulatory requirements imposed by the United Kingdom Government's Department of Trade & Industry, Equitas validly assigned to Lloyd's its right to collect the Equitas premium from Names.

18. In order to collect the outstanding monies in respect of the Equitas premiums, Lloyd's commenced a substantial programme of debt collection. In that regard, a large number of Writs were issued by Lloyd's against those Names who had decided not to accept the Settlement Offer and declined to make payment in respect of their outstanding Equitas premiums (the "Non-Accepting Names").

19. One of these Non-Accepting Names was Sundlun. The separate proceedings against him were commenced in the High Court of Justice, Queen's Bench Division in London, England. Lloyd's sought payment of Sundlun's Equitas premium plus unpaid interest thereon and to enforce Sundlun's contractual obligations.

20. In the case of Sundlun, in accordance with the terms of the Equitas reinsurance contract, Lloyd's served the writ of summons on his Substitute Agent, AUA9, notifying it of commencement of the English action. A true and accurate copy of the Writ of Summons is attached hereto as *Exhibit 5*.

21. By serving AUA9 in this manner, Lloyd's property effected service on Sundlun. A true and accurate copy of said Affidavit attesting to service is attached hereto as *Exhibit 6*.

22. In addition, by letter dated May 28, 1997, AUA9 sent Sundlun by mail copies of the Writ of Summons and form for Acknowledgment of Service with which it had been served. A true and accurate copy of said letter is attached hereto as *Exhibit 7*.

23. By letter dated June 24, 1997, Sundlun acknowledged receipt of a courtesy copy of the writ of summons sent to him by Lloyd's solicitors, Dibb Lupton Alsop, on 23 May 1997. A true and accurate copy of the relevant correspondence is attached hereto as *Exhibit 8*.

24. Sundlun did not contest the proceedings brought against him. Accordingly, the English court entered judgment in favour of Lloyd's and against Sundlun on June 24, 1997 (the "English Judgment"). A true and accurate copy of the English Judgment is attached hereto as *Exhibit 9*.

25. By letter dated July 2, 1997, Sundlun was informed that default judgment had entered against him. A true and accurate copy of said letter is attached hereto as *Exhibit 10*.

26. Once it became clear that Lloyd's right to recover the Equitas premium in the context of that debt collection programme was to be subject to challenge by many of the Non-Accepting Names (although not by Sundlun), three "test cases" were selected in order to test whether certain allegations made by the Non-Accepting Names constituted arguable defences to Lloyd's proceedings.

27. The arguments put forward in the "test cases" (through the Names' solicitor and counsel) as defences to Lloyd's claims included, *inter alia*, the "non-fraud" arguments relating to the statutory and contractual powers of Lloyd's to implement the R&R plan, the validity of the appointment of AUA9 as Substitute Agent, as well as various "fraud" arguments advanced by the Non-Accepting Names. The conduct of these "test cases" was assigned to Mr. Justice Colman. For case management purposes, the hearings before Mr. Justice Colman were divided into two parts: Part 1 dealt with the "non-fraud" defenses and Part 2 considered the "fraud" defenses to Lloyd's claims.

28. The hearings of the Part 1 issues took place before Mr. Justice Colman between December 1996 and January 1997. The Part 2 hearings took place before Mr. Justice Colman in February 1997. The outcome of these hearings was that all the defences raised by the Non-Accepting Names to Lloyd's claims were dismissed against the three "test case" Names. Included among Mr. Justice Colman's findings was the determination that the appointment of AUA9 as a Substitute Agent was valid. A copy of Mr. Justice Colman's February 20, 1997 decision (part 1 issues) is attached as *Exhibit 11*. The three "test case" Names appealed the decision of Mr. Justice Colman to the Court of Appeal.

29. Following a two-day hearing before the Court of Appeal in July 1997, the Court of Appeal dismissed the Names' appeal. Lord Justice Saville (as he then was), delivering the judgment of the Court, held that there was no substance to any of the "test case" Names' claims to an arguable defence. Specifically, Lord Justice Saville held that (1) Lloyd's acted within the terms of its statutory authority under the *Lloyd's Acts* 1871-1982 in implementing the R&R plan, (2) Names may not avoid payment of the Equitas premium by rescinding the General Undertaking because to do so would mean that the Name had unlawfully conducted insurance business in the U.K., and (3) the reinsurance contract between Names, Equitas and others was fully effective thereby requiring Names to pay the Equitas premium free and clear from any set off, counterclaim or any other deduction. *Society of Lloyd's v. Leighs, Lyon and Wilkinson*

(Court of Appeal 31 July 1997). In January 1998, the Judicial Committee of the House of Lords refused the petition for leave to appeal from the decision of the Court of Appeal.

30. In total, the English courts held hearings over 32 days and issued opinions totalling hundreds of pages addressing the Names' objections and defences to enforcement of the Equitas reinsurance contract and payment of the premium. Lloyd's submitted a substantial number of affidavits in support of its position, reams of documentary evidence, as well as numerous legal memoranda. The Names also submitted numerous affidavits, documentary evidence and legal memoranda. Furthermore, both sides were afforded time to argue their respective positions to the court. In the end, all issues as to Lloyd's rights to recover the outstanding Equitas premiums were determined in Lloyd's favor.

31. More recently, in *Society of Lloyd's v. Richard Tropp*, Mr. Justice Gross of the Commercial Court, Queen's Bench Division considered arguments from an American Name against whom Lloyd's had commenced proceedings which were served on AUA9 relating to the Name's unpaid Equitas premium. The Name argued that AUA9, his Substitute Agent, had not been properly authorized to accept service of process on his behalf. In a decision issued on January 20, 2004, Mr. Justice Gross rejected these arguments and concluded that AUA9 was authorized to accept service. A copy of this opinion is attached as *Exhibit 12*.

32. The English Judgment entered against Sundlun is final, conclusive and fully enforceable in England. No appeal is possible within the English legal system and no stay has been issued preventing enforcement of the judgment. Post-judgment interest in the amount of eight percent is currently accruing on the judgment. Despite numerous attempts by Lloyd's to settle its claims, Sundlun has failed to take any action to reduce or satisfy the English Judgment, leaving the entire amount of the judgment (less the amount of £2.68 which has been received by Lloyd's and credited against the judgment), together with interest that is currently accruing, due and owing.

33. If Sundlun did not learn that a legal action had been brought against him by Lloyd's in England until after a judgment had been obtained, English law would have permitted

him to make an application to the High Court of Justice, Queen's Bench Division to set aside the judgment. The High Court of Justice, Queen's Bench Division, would then have the discretion to determine whether to set aside the judgment and allow him to defend the claim. No such application was filed, however, by Sundlun.

I declare under penalty of perjury under the Laws of the United States of the America that the foregoing is true and correct. Executed on the 27th day of September 2006 at London, England.

N. P. Demery

Nicholas Demery

**CERTIFICATION**

I hereby certify that a true copy of the within *DECLARATION OF NICHOLAS DEMERY* was filed electronically with the United States District Court for the District of Rhode Island and is available for viewing and downloading from the Electronic Case Filing system. The following attorney received service by electronic means on this 30th day of October 2006:

Robert G. Flanders, Jr., Esquire
HINCKLEY ALLEN SNYDER LLP
1500 Fleet Center, Providence, RI 02903

/s/ Matthew T. Oliverio