[2004] EWHC 33 COMM

Case No: 2002/848

**IN THE HIGH COURT OF JUSTICE**
**QUEENS BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 20 January 2004

**Before :**

**THE HONOURABLE MR JUSTICE GROSS**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

| | |
|---|---|
| **The Society of Lloyd's** | **Claimant** |
| **- and -** | |
| **Richard A Tropp** | **Defendant** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Louise Hutton** (instructed by **The Legal Services Dept. of the Society of Lloyd's**) for the Claimant
**Richard A Tropp (Defendant in Person**

Hearing dates : 16 January 2004

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................
THE HON MR JUSTICE GROSS

Mr Justice Gross :

INTRODUCTION

1. This is an application by the Defendant ("Mr. Tropp") under CPR Part 11 to set aside, as the Application Notice dated 28th April, 2003 puts it, the "alleged service" of the claim form and to "dismiss the claim with prejudice". Essentially, Mr. Tropp says that the Claimant ("Lloyd's") should have served him outside the jurisdiction and that its service of proceedings on Additional Underwriting Agencies (No. 9) ("AUA 9") within the jurisdiction was bad.

2. The claim made by Lloyd's against Mr. Tropp in these proceedings is for payment of the Equitas reinsurance premium due pursuant to the Reinsurance and Run-Off Contract of 3rd September 1996 ("the RI contract"), entered into by (inter alia) Equitas Reinsurance Ltd ("ERL") and Mr. Tropp. The benefit of that contract, together with interest, was assigned by ERL to Lloyd's, as evidenced by a deed of assignment dated 2nd October 1996.

3. Mr. Tropp is a citizen of the United States of America and is not domiciled in the United Kingdom.

4. Clause 25.2 of the RI contract provides as follows:

> "Each Name and Closed Year Name not domiciled in the United Kingdom hereby irrevocably appoints the Substitute Agent as agent to accept service of any proceedings in the English Courts on his behalf ...".

5. There is no dispute that "the Substitute Agent" referred to in cl. 25.2 was AUA 9.

6. Likewise, it is not in dispute that the proceedings in this case were in fact served on AUA 9.

7. As already foreshadowed, Mr. Tropp contends that such service was not valid service and, on this ground, asks the court to decline jurisdiction to hear the claim.

THE RIVAL ARGUMENTS

8. Mr. Tropp's argument proceeded as follows: *First*, by way of introduction, Mr. Tropp does not dispute that AUA 9 had authority to enter into the RI contract on his behalf. He does not challenge, as he put it orally, the need for "universality" in this regard. His argument does not entail the invalidity of the whole of the RI contract.

9. *Secondly,* the Court was not bound by any previous decision and, in particular, by The Society of Lloyd's v Leighs [1997] CLC 759 (Colman J) and 1398 (CA) to decide this application in favour of Lloyd's and against Mr.Tropp. As far as it goes, this submission was not disputed by Ms Hutton who appeared for Lloyd's.

10. *Thirdly,* Mr. Tropp was anxious to underline that he was not in the habit of litigating and has not (previously) been a litigating name. He was here to seek justice; not to avoid the jurisdiction. As to the motivation for this application it was twofold: (i) In broad terms ("the US remedies argument") he had wanted to be served in the United States ("US") because once the matter was in a US jurisdiction, there would have been opportunities open to him to obtain evidence which he could not obtain in this jurisdiction. Had he been personally served there, Mr. Tropp insisted that he would not have contested the English jurisdiction but he would have applied to a US Court for disclosure of material denied him here. (ii) In narrower terms ("the time bar point"), there was a prospect that if Lloyd's had not been entitled to serve the proceedings on AUA 9, then it was now out of time for serving Mr. Tropp personally in the US. At the very least, Lloyd's would need now to extend time for service of the Claim Form. I express no view on the merits of the US remedies point, though the fact that Mr. Tropp and, perhaps, others might have been minded to seek such relief is a matter to which I must return later. On any view however, as the time bar point would be, at the least, plainly arguable, this application cannot be seen as time wasting or as having no useful purpose.

11. *Fourthly,* the CPR regime for service of proceedings was to be strictly applied; see decisions such as Anderton v Clwyd County Council (No.2) [2002] EWCA Civ 933; [2002] 1 WLR 3174 and Wilkey v BBC [2002] EWCA Civ 1561; [2003] 1 WLR 1. As it seemed to me, it was appropriate to proceed on the basis that this submission was correct. No question of the court's power or discretion to waive any irregularity would arise unless or until I was first persuaded that Mr. Tropp was correct in saying that Lloyd's had not been entitled to serve AUA 9.

12. *Fifthly*, coming to the meat of the argument, service of the proceedings on AUA 9 was bad because, in summary: (I) AUA 9 did not exist ("the existence of AUA 9"); (II) Mr. Tropp had not personally authorised AUA 9 to accept service on his behalf and/or any such appointment of AUA 9 by Lloyd's to do so or the taking of authority by AUA 9 itself to do so, was outwith any authority granted by Mr. Tropp ("the authority of AUA 9"); it was to be kept in mind that AUA 9 had been appointed as a substitute managing agent not a members' agent; (III) AUA 9 as an entity under the control and direction of Lloyd's could not validly be appointed as an agent to accept service on behalf of Mr. Tropp, by reason of a conflict of interest ("conflict of interest").

13. For Lloyd's, Ms Hutton's submissions may be shortly summarised as follows: (1) AUA 9 plainly exists. (2) As is common ground, AUA 9 was authorised to bind Mr. Tropp to the RI agreement. AUA 9 was therefore authorised to agree to cl. 25.2 on his behalf, unless a service of process clause was so unusual or improper as to be outwith the scope of its authority to enter into the RI contract. Neither in general nor in the present context could it be said that a service of process clause was unusual or

improper; in particular in the present context, such a clause was both reasonable and justified on grounds of practicality. It mattered not that Mr. Tropp had not personally executed the RI contract or separately, directly or specifically authorised AUA 9 to accept service on his behalf. Insofar as the contrary was suggested, there was no basis for reading any restriction into the scope of the wording of cl. 25.2. (3) There was no or no relevant conflict of interest. In any event, no question arose of AUA 9 having any discretion to exercise; its function as agent for accepting service was mechanical or ministerial only. Mr. Tropp's objections in this regard were misconceived.

14. I should record that the hearing before me proceeded with conspicuous courtesy. I am grateful to Mr. Tropp for the manner in which he presented his submissions and to Ms. Hutton (and those instructing her) for their assistance throughout.

15. I turn to the three principal Issues which I have sought to identify in the rival arguments.

ISSUE (I): THE EXISTENCE OF AUA 9

16. With respect, there is nothing in this point; AUA 9 plainly exists as a separate corporate entity. To be fair to Mr. Tropp, this was a point more emphasised in his written materials than in oral argument. For completeness, Mr. Tropp's own Witness Statement in earlier CPR Part 31 proceedings exhibits AUA 9's Certificate of Incorporation. Further, Mr. Tropp's Witness Statement in support of the present Part 11 application exhibits a Companies House annual return for AUA 9. That AUA 9 is or may be a company without any or significant assets or a company controlled by Lloyd's is neither here nor there. It exists.

ISSUE (II): THE AUTHORITY OF AUA 9

17. *(1) Introduction:* Putting the matter neutrally for the moment, the mode of service purportedly followed by Lloyd's in this case was service pursuant to a contract. Such service is governed by CPR, Part 6.15, which, so far as material, provides as follows:

> "(1) Where – (a) a contract contains a term providing that, in the event of a claim being issued in relation to the contract, the claim form may be served by a method specified in the contract; and (b) a claim form containing only a claim in respect of that contract is issued, the claim form shall …be deemed to be served on the defendant if it is served by a method specified in the contract."

18. The note at *Civil Procedure, para. 6.15.2* says this:

> " There has long been provision for service pursuant to a contract. Rule 6.15 is a modernised version of RSC 0.10, r.3. The rule makes it clear that service of a claim form pursuant to

> a provision in a contract is good service where the English court has jurisdiction to try the claim whether jurisdiction is conferred by a term of a contract or vests or is assumed by the court apart from such contract. "

19. To complete the introduction, it is, as already foreshadowed, common ground that AUA 9 had authority to enter into the RI contract on Mr. Tropp's behalf. Once that is accepted – and had it not been accepted as it sensibly has been by Mr. Tropp, the contrary would have been unarguable in the light of Leighs to which I have already referred - then it follows that the RI contract binds Mr. Tropp. At first blush therefore, Mr. Tropp is bound by cl. 25.2 thereof, which provides for service of proceedings on AUA 9. Against this background, I turn to the arguments advanced by Mr. Tropp to resist this conclusion.

20. *(2) Personal execution or authorisation:* In summary, Mr. Tropp contended that the authorities on acceptance of service pursuant to a contract all involved the appointment or authorisation of the agent by the principal personally. By contrast, here, Mr. Tropp was bound to the RI contract by AUA 9 and AUA 9 then appointed itself agent to accept service.

21. I cannot accept this submission. The authorities on which Mr. Tropp relied (and which it is unnecessary to set out here) lend him no assistance. Even assuming (without deciding) that they all involve examples of the principal personally appointing the agent for service, that is not the principle for which those decisions are authority. Instead, the principle in question is that where the English Court has jurisdiction to try the claim, service pursuant to a contractual provision will be treated as good service. The essence of the matter is agreement; it is beside the point whether the agreement is made by a contractual party personally or by or through an authorised agent. Were it otherwise the curious position would be reached that P was bound by service on X if X had been appointed by P personally but not if X had been appointed by A, P's authorised agent. That cannot be right. I turn to Mr. Tropp's next submission.

22. *(3) The appointment of AUA 9 as Mr. Tropp's agent to accept service was outwith any authority granted by Mr. Tropp:* The argument here is that it is one thing for AUA 9 to have been authorised to bind Mr. Tropp to the RI contract in respect of reinsurance; that was a matter delegated by Mr. Tropp to others in the context of the business of his underwriting at Lloyd's. It was, however, quite another matter to bind him to a provision for service of proceedings on an agent in this country. AUA 9 was a substitute managing agent not a substitute members' agent. Further, it was to be noted that striking down cl. 25.2 did not serve to invalidate the reinsurance arrangements under the RI contract: see cl. 21 dealing with the severability of invalid or unenforceable provisions.

23. Attractively as Mr. Tropp advanced this submission, I am satisfied that it is not well-founded.

24. The starting point must be that AUA 9 was entitled to and did bind Mr. Tropp to the RI contract; as already discussed that point is both common ground and concluded by Leighs. The question here is therefore not whether AUA 9 as a substitute managing agent was entitled to accept service of process. Rather, as correctly characterised by Ms. Hutton, it is whether there is anything so unusual or improper about this service of process clause so that it was outside the scope of AUA 9's authority to agree to its inclusion in the RI contract - designed as that contract was to address problems fundamental to the existence of Lloyd's. Indeed, the point has to be taken further; given that AUA 9 was directed by Lloyd's to enter into the RI contract in accordance with its terms (as an integral part of the Reconstruction and Renewal scheme, "R&R"), the question is whether Lloyd's was entitled to direct the inclusion of a clause of this nature. For the reasons which follow, I am satisfied that Lloyd's was so entitled and that AUA 9 was accordingly entitled to bind Mr. Tropp to it.

25. First, there is nothing uncommercial or unusual about service of process clauses generally: see the note at *Civil Procedure, 6.15.2*, set out above. Subject only to any questions arising in connection with the argument as to conflict of interest (dealt with later), there is nothing remarkable about cl.25.2.

26. Secondly, in the context of business at Lloyd's, there is nothing unusual about a provision that service on a name may properly be effected by service on a nominated or designated agent within this jurisdiction. Ms. Hutton told me on instructions – and I accept – that such clauses are included in both the standard form members' and managing agents' agreements.

27. Thirdly, the context of the RI contract was the R&R scheme. Overwhelming considerations of convenience and practicality call for just such a clause in respect of names not domiciled in the United Kingdom. Indeed, Mr. Tropp's own stated intention of otherwise pursuing the US remedies argument (noted earlier) points to the desirability of a clause of this nature. The alternative of satellite litigation in sundry other jurisdictions is deeply unattractive.

28. Fourthly, cl. 25.2 does not, of course, stand in isolation. It exists instead as a useful and reasonable adjunct to the English Law and exclusive jurisdiction clause contained in the RI contract, namely, cl. 25.1. To that provision, Mr. Tropp makes no objection.

29. Fifthly, in all these circumstances, a clause providing for service of process in this jurisdiction is, in this contract, a proper ancillary procedural clause which Lloyd's and AUA 9 were entitled to include. Although on this application the Court is not bound by Leighs to arrive at this result, analogous considerations reinforce the conclusion to which I have come. Further and although neither party took me to this material in any detail, I can see nothing in the Lloyd's Byelaws, Resolutions and Directions set out in or exhibited to Mr. Martin's Second Witness Statement which suggests that cl.25.2 was somehow outside the scope of the authority granted by Mr. Tropp to Lloyd's and/or AUA 9.

30. *(4) The scope of the wording of cl. 25.2:* Finally here, Mr. Tropp argued that even if AUA 9 was authorised to accept service of claims by policy holders against all names on a pre-R&R syndicate who had been reinsured into Equitas, such authority did not extend to authorising AUA 9 to accept service of claims by ERL (or Lloyd's as ERL's assignee) against Mr. Tropp for unpaid reinsurance premium.

31. I cannot agree. The conversations to which Mr. Tropp referred in his skeleton argument as to the intended scope of cl. 25.2 do not take the matter further. The wording of cl. 25.2 contains no such restriction and I can see no good reason for reading any such restriction into the clause. To the contrary, having regard to the nature of the RI contract and the obligations assumed thereunder, there is very good reason for cl. 25.2 applying to claims against names for unpaid reinsurance premium.

ISSUE (III): CONFLICT OF INTEREST

32. Basing himself on general principles of agency law, Mr. Tropp's argument is essentially that, as AUA 9 was entirely under the direction and control of Lloyd's, it could not act as Mr. Tropp's agent to accept service of proceedings. Mr. Tropp had given no "informed consent" to AUA 9 acting as his agent. I am unable to accept these submissions. My reasons follow.

33. *(1) No general limitation:* While authority is in no sense decisive of this question, such pointers as there are lend no support to Mr. Tropp. Certainly, no authority suggests that there is any general limitation, based on an agent's relationship with a claimant, which precludes that agent from validly accepting service on behalf of a defendant in the same proceedings.

34. Strikingly, in Reversionary Interest Society v Locking [1928] WN 227, no doubt was cast on the validity of a provision permitting service of proceedings on the defendant by leaving the writ or summons or a copy thereof with the secretary or actuary for the time being of the plaintiff. It is true that the reasoning in the judgment (at least as reported) is sparse indeed and not apparently directed at the point under consideration here. Moreover, it does not appear that the defendant was represented. That said, if there was some fundamental limitation of the nature described, it is at least odd that alarm bells did not ring. Further, in the present case, unlike Locking, the agent for service is a separate corporate entity from the claimant; accordingly, this is not a case of Lloyd's effecting service simply by leaving the claim form and other documents with itself. The documents had to be served on AUA 9.

35. In The Society of Lloyd's v West (unreported, 28th November, 1997), Mance J., as he then was, said (at p.5 of the transcript):

> " .. it is clear that under the relevant bylaws, AUA 9, which is a substitute agency appointed in substitution for the managing agents of Mr. West's syndicates, had or would have had authority to receive service had it been effected on them."

Later in the judgment (at p.15), Mance J. described AUA 9 as an "imposed agent". It is fair to say that the issue before Mance J. in West was very different and that he was not faced with any argument as to conflict of interest; his observations have to be read with that in mind. But it is nonetheless perhaps surprising, if the relationship between AUA 9 and Lloyd's can properly be relied upon to challenge the validity of a service of process clause on a matter as fundamental as a conflict of interest, that the point does not appear to have troubled the learned Judge or counsel at all.

36. *(2) No room for the principles of conflict of interest:* In Leighs at first instance, the issue of a conflict of interest was raised in the course of argument as to whether names, who had not accepted the R&R settlement offer, could be bound to the RI contract. In a passage in his judgment, unchallenged on the appeal, Colman J. said this (at p.786):

> "... there cannot logically be any room for the intrusion of the well-known principles of conflict of interest ...[AUA 9] has no choice in the matter. Nor does the name. Both are bound by the byelaws and resolutions of the council. This is not the case of an ordinary arms-length principal and agent relationship but of a formalised agency within the confines and constraints imposed by the legislative regime of the market into which both agent and name have contracted. The point is therefore fundamentally misconceived ...".

37. I respectfully agree. There is no room for the principles of conflict of interest here either. Whether regard is had to the framework within which the RI contract and cl. 25.2 are contained or to AUA 9's relevant role, there was no choice in the matter. As to the framework, it is as described in Leighs. As to AUA 9's role in accepting service of process, it formed part of the implementation of the RI contract and was (as discussed further below) purely ministerial and mechanical. It would be remarkable if there was no room for the principles of conflict of interest when considering whether Lloyd's and/or AUA 9 could bind Mr. Tropp to the RI contract at all but if a conflict of interest was held to exist when it came to AUA 9 accepting service of proceedings under cl. 25.2.

38. *(3) No conflict:* In any event, when addressing the present argument, it is of the first importance to focus on the true capacity of AUA 9. In its capacity as Mr. Tropp's agent for accepting service of proceedings, AUA 9 was not affected by any or any relevant conflict of interest. Very different concerns might well arise if AUA 9 had some wider role; but that is not this case. Here, AUA 9 would be acting as a post box. No discretion would be involved. If the proceedings came within cl. 25.2, AUA 9 would be bound to accept service; if not, AUA 9 would not be entitled to accept service. In this capacity, AUA 9 was Mr. Tropp's agent alone; in the litigation which would ensue AUA 9 would have no, certainly no continuing role as an agent for Lloyd's or indeed any party with an interest adverse to Mr. Tropp. In these circumstances, the fact, if it be the fact, that AUA 9 was (as Mr. Tropp put it) "entirely under the direction and control" of Lloyd's, is neither here nor there. Such control does not make AUA 9 Lloyd's agent in relation to the acceptance of service of

proceedings so as to give rise to any conflict of interest. The position may readily be distinguished from that prevailing in cases such as Anglo-African Merchants v Bayley [1970] 1 QB 312. The difficulty there was not control but the existence of an actual conflict of interest, continuing during the litigation arising from the broker accepting an engagement from underwriters inconsistent with his duty to the assured.

39. If and insofar as separate consideration needs to be given to questions of Mr. Tropp's informed consent, my conclusion is unaffected. First, the connections between Lloyd's and AUA 9 are open and not secret. Secondly, the inquiry simply leads back to the earlier discussion, here and in Leighs, of the authority given by Mr. Tropp to Lloyd's and/or AUA 9 to bind him to the RI contract in accordance with its terms.

40. For completeness: (i) If it be the case that Mr. Tropp has had difficulty in his dealings with employees of Lloyd's and/or AUA 9 with regard to matters falling within the scope of AUA 9's agency for him (I reach no conclusion on these allegations), suffice it to say that this is a matter going to the performance of the agency rather to a conflict of interest precluding AUA 9 from acting for Mr. Tropp. (ii) To address a point raised by Mr. Tropp, documents coming into AUA 9's possession as part of its general business (and not in its capacity as Mr. Tropp's agent for the acceptance of service of proceedings under cl.25.2) would not be held by it as agent for Mr. Tropp.

41. *(4) Conclusion:* If, as I have already determined, AUA 9 was otherwise authorised to accept service of proceedings on behalf of Mr. Tropp, such authority is not invalidated by any considerations of Lloyd's control and direction of AUA 9.

## OVERALL CONCLUSION

42. In the circumstances, Mr. Tropp's application must fail and is dismissed. These proceedings were validly served on AUA 9. It is unnecessary to express any view on the position which might have arisen had I reached a different conclusion. I shall appreciate assistance from the parties in connection with drawing up the order and all questions of costs.