A

# Society of Lloyd's v Leighs & Ors.

Queen's Bench Division.
Colman J.
Judgment delivered 20 February 1997.

B

*Lloyd's insurance market – Lloyd's sought summary judgment to recover Equitas reinsurance premium – Names who had not assented to reconstruction and renewal plan refused to pay Equitas premium – Whether defendants had arguable defences – Whether defendants who had not accepted plan could be bound by payment provisions – Whether Equitas scheme outside original scope of Lloyd's venture – Whether Lloyd's had title to sue.*

C

**These were three actions (and test cases) in which Lloyd's applied for summary judgment under O. 14 for moneys allegedly due from the defendants under the Lloyd's reconstruction and renewal plan ('R & R').**

**R & R in its final form was put forward by Lloyd's in a settlement offer document in July 1996. The settlement agreement involved a mutual waiver of claims by Lloyd's and the names. The names who accepted the settlement offer waived all claims in respect of 1992 and prior years. Under R & R Equitas was to reinsure the non-life liabilities of all the names in respect of the 1992 and prior years of account. The funding of Equitas was to be by means**

D

**of moneys paid by Lloyd's from its central fund and derived from various sources and by premium paid by all the names whose outstanding liabilities, both known and unknown, were reinsured by it. The Equitas reinsurance cover extended to the entire non-life market in respect of the 1992 and prior years to the effect that even those names who did not accept the R & R settlement offer (fewer than ten per cent of the whole) and who therefore did not participate in the mutual waiver of claims, nevertheless had their liabilities reinsured by Equitas and were required to pay a premium for that protection.**

E

**The issue between the parties was whether Lloyd's was entitled to impose the Equitas reinsurance contract on non-accepting names. The defendants submitted that they had good arguable defences to Lloyd's claims on various grounds, of which two categories were argued: (1) the defendants did not accept R & R and therefore could not as a matter of law be bound by the payment provisions which formed part of it; (2) Lloyd's had no title to sue in respect of moneys payable under R & R.**

F

***Held*, giving judgment for Lloyd's under O. 14A:**

**1. As a matter of law the defendants could not withdraw the authority of their managing agents and run-off agents to enter into a future reinsurance contract which had the effect of reinsuring the 1992 and prior years. It followed that when Lloyd's appointed a substitute managing agent in 1996, it did not succeed to an authority vis-à-vis the defendants which was subject to any constraint as regards entering into the Equitas reinsurance contract. Nor**

G

**could the name withdraw such authority from the substitute agent by giving notice to it or to Equitas.**

**2. Since each of the defendants was under an obligation to Lloyd's under the general undertaking to comply with the byelaws and the resolutions and directions of the council, they were in any event bound to accept that they had been made parties to the Equitas reinsurance contract having regard to the R & R byelaw of 1995 and to the council's**

H

**resolution and direction of 3 September 1996 unless that internal legislation was invalid because its effect was to introduce so substantial a departure from the pre-existing venture as to create a fundamentally different bargain from that which is taken to have been originally contemplated by the parties.**

**3. The argument based on the Equitas Scheme being outside the scope of the venture was unsustainable. It wrongly elevated the details of run-off reinsurance to fundamental and**

immutable features of the venture of underwriting at Lloyd's. As those were no more than ancillary features of the business of underwriting, byelaws which had no greater effect than changing those features in the advancement and protection of the interests of members in connection with the business carried on by them had a purpose which was ancillary or collateral to the venture as distinct from a purpose which involved the substitution of a fundamentally different venture. A

4. Even if there were elements of 'mutualisation' involved in the pooling of assets for the purpose of obtaining reinsurance, the elements of the scheme were all ancillary to the names' Lloyd's venture and came nowhere near the substitution of a fundamentally different venture outside the scope of that in which the defendants initially participated. B

5. The use of the substitute agent as an instrument for imposing uniformity on the market was a clearly justifiable operation of the Substitute Agents Byelaws. In as much as the substitute agent was to be used exclusively for the purpose of effecting the Equitas Scheme, which was in itself a legitimate exercise of Lloyd's legislative powers within the scope of the underwriting venture, the interposition of the substitute agent could not of itself be said to represent a departure from that venture. C

6. There was no realistic prospect of the defendants succeeding at trial in showing that Lloyd's acted unreasonably in imposing the Equitas part of R & R on non-assenting names.

7. The substitute agent was validly appointed. D

8. The substitute agent stood in the shoes of the managing agents or run-off agents for all purposes and, just as notice to such agent of assignment of premium by an external run-off reinsurer would be an effective notice to that agent's underwriting names, so the notice to the substitute agent by Equitas was an effective notice of assignment to the defendants. Valid notice of assignment having been given, Lloyd's had title to sue in is own name.

The following cases were referred to in the judgment: E

*Associated Provincial Picture Houses Ltd v Wednesbury Corp* [1948] 1 KB 223.
*Daly v Lime Street Underwriting Agencies Ltd* (The Times, 8 June 1987, Staughton J).
*Hole v Garnsey* [1930] AC 472.
*Napier (Lord) v R F Kershaw Ltd* [1996] CLC 1875.
*R v Council of the Society of Lloyd's, ex parte Johnson* (unreported, 16 August 1996).
*R v Secretary of State for Trade and Industry, ex parte Lonrho plc* [1989] 1 WLR 525. F
*Smart v Sandars* (1848) 5 CB 895; 136 ER 1132.
*Walsh v Whitcomb* (1797) 2 Esp NPC 565; 170 ER 456.
*Weddell v JA Pearce & Major* [1988] 1 Ch 26.

Gordon Pollock QC, R Jacobs and D Foxton (instructed by Freshfields) for the plaintiffs.

Romie Tager QC, C Orr and I Newman (instructed by Epstein Grower) for the defendants. G

C Falconer QC and C Orr (instructed by Warner Cranston) for the intervenor names.

## JUDGMENT

**Colman J: Introduction** H

In the three actions now before the court Lloyd's apply for judgment under O. 14 for moneys allegedly due from the defendants under the reconstruction and renewal plan ('R & R') which was brought into operation in September 1996. The defendants, all of whom were underwriting names at Lloyd's in or before 1992, argue that they have good arguable defences to the claims on various grounds which can be divided into three broad categories:

© 1997 CCH Editions Limited

A (1) defences based on the submission that the defendants did not accept R & R and therefore cannot as a matter of law be bound by the payment provisions which form part of it;

(2) Lloyd's title to sue in respect of moneys payable under R & R;

B (3) defences based on the allegation that the defendants were induced by fraud on the part of Lloyd's to become underwriting names and that Lloyd's cannot therefore now recover amounts which would otherwise be due.

These defendants appear to contemplate a further defence based on art. 85 of the Rome Treaty but this has not so far been clearly formulated and Mr Tager who appeared for the defendants frankly told me that he was not able at this stage and on the materials presently available to specify the factual basis on which this defence could be advanced. It can therefore be ignored for present purposes.

C In view of the fact that the group (3) fraud defence will involve consideration of a substantial volume of evidence and would have taken longer to prepare even for an O. 14 hearing, I ordered that the proceedings for summary judgment should be the subject of two separate hearings, the first to be exclusively concerned with the defences in groups (1) and (2) not involving fraud and, in the event of my holding that an arguable defence had not been established on any of those bases, the second hearing to be concerned with the group (3) fraud defences.

D I should also add that, in addition to the three defendants involved in these O. 14 applications there are many other underwriting names who did not agree to accept R & R but against whom Lloyd's has commenced proceedings for amounts due under R & R. If those names challenge Lloyd's claims, the group (1) and (2) defence issues are bound to arise in those cases. Accordingly the present proceedings are to be treated as a test case at least on these issues. If the group (1) and (2) defences are held in these proceedings not E to amount to arguable defences, and it therefore becomes necessary to determine whether the group (3) fraud defences are arguable, it may be that the determination of this court on those defences will also be determinative on that issue should it arise in the proceedings against the other names.

Finally, Lloyd's has commenced proceedings for amounts due under R & R against 191 non-accepting Canadian names. No O. 14 proceedings have been commenced against F any of those names at this stage. By order dated 15 November 1996 I gave leave to some 179 of those names to intervene in these proceedings because it appeared that they wished to rely on the group (1) and (2) non-fraud defences and on fraud defences which might raise issues similar to those arising under the group (3) defences of the three defendants in these proceedings. Those Canadian names also wish to rely on certain defences based upon the Canadian securities and exchange legislation. If it is determined that the group (1) and (2) defences are not good arguable defences, and Lloyd's proceed by way of G O. 14 against any of the Canadian names it will be necessary to determine at a later hearing whether the Canadian legislation defences represent good arguable defences.

It is accepted by all parties and I have so ordered that in the event of its appearing that any of the group (1) and (2) defences are good defences as a matter of law I should give judgment on those issues for the defendants under RSC, O. 14A.

H **The nature of R & R and the basis of Lloyd's claims**

Before considering the basis of Lloyd's claims it is necessary to outline the structure of R & R and how it worked.

The purpose of R & R was to resolve the acute financial difficulties and internal disputes which had affected Lloyd's from 1990 onwards. There were two main aspects of these problems. First there was the immensity of the outstanding liabilities of names and

the inability of many of those names to pay their proportion of losses already incurred and to provide for anticipated and unreported losses. Second, there was a proliferation of litigation in which Lloyd's sought to recover from names amounts due in respect of their proportion of losses and in which names claimed damages against underwriting agents, managing agents, brokers, syndicate auditors and Lloyd's itself substantially in respect of negligent underwriting, breach of agency duties, negligent auditing and defective supervision and control of the market. A

R & R in its final form was put forward by Lloyd's in a settlement offer document ('SOD') in July 1996. Lloyd's offered names a settlement of certain claims in respect of 1992 and prior underwriting years, including any 1992 and prior year liabilities reinsured to close into later underwriting years. The settlement agreement involved a mutual waiver of claims by Lloyd's and the names. A claim was very widely defined. Lloyd's agreed to a waiver of all debts to the central fund in respect of 1992 and prior years, as well as certain claims in respect of litigation costs. The names were to pay all amounts due in respect of their finality statement and to satisfy all outstanding obligations of years of account other than 1992 and prior years and, provided that they did so, they would be free to cease to be a member of Lloyd's and Lloyd's undertook to make no further claims against them. B C

The names who accepted the settlement offer waived all claims in respect of 1992 and prior years against Lloyd's, Equitas, agents, the errors and omissions insurers of agents, auditors who contributed to the auditor settlement fund and brokers. D

The foundation of the R & R settlement offer was the Equitas Group. The function of Equitas was to reinsure the non-life liabilities of all the names in respect of the 1992 and prior years of account. It was a condition precedent to the settlement agreement that Equitas had executed the reinsurance contract. Names who entered into the settlement agreement undertook to take all necessary steps to facilitate payment of the premium to Equitas. The funding of Equitas was to be by means of moneys paid by Lloyd's from its central fund and derived from various sources and by premium paid by all the names whose outstanding liabilities, both known and unknown, were reinsured by it. The key feature of R & R for the purposes of the present claims by Lloyd's is that the Equitas reinsurance cover extended to the entire non-life market in respect of the 1992 and prior years to the effect that even those names who did not accept the R & R settlement offer (fewer than ten per cent of the whole) and who therefore did not participate in the mutual waiver of claims, nevertheless had their liabilities reinsured by Equitas and were required to pay a premium for that protection. The fundamental issue between the parties to these proceedings is whether Lloyd's was entitled to impose the Equitas reinsurance contract on non-accepting names. The defendants do not challenge the Equitas Scheme as a whole: they challenge the imposition of it on non-accepting names. It is therefore necessary to trace the legislative steps by which Lloyd's claim to be entitled to achieve this result. E F G

**The means of imposition of the Equitas premium**

The Council of Lloyd's has the management and superintendence of the affairs of Lloyd's and such powers are to be exercised in accordance with and subject to the provisions of Lloyd's Acts 1871 to 1982 and the byelaws made under those Acts. Section 6 of the 1982 Act provides as follows:

> '(1) The Council shall have the management and superintendence of the affairs of the Society and the power to regulate and direct the business of insurance at Lloyd's and it may lawfully exercise all the powers of the Society, but all powers so exercised by the Council shall be exercised by it in accordance with and subject to the provisions of Lloyd's Acts 1871 to 1982 and the byelaws made thereunder. H
>
> (2) The Council may:

© 1997 CCH Editions Limited

A (a) make such byelaws as from time to time seem requisite or expedient for the proper and better execution of Lloyd's Acts 1871 to 1982 and for the furtherance of the objects of the Society, including such byelaws as it thinks fit for any or all of the purposes specified in Schedule 2 to this Act; and

(b) amend or revoke any byelaw made or deemed to have been made hereunder.'

Amongst the purposes listed in Sch. 2 to the 1982 Act, one finds at para. (18):

B 'For empowering the Council to nominate and appoint an underwriting agent (in this paragraph referred to as the "substitute agent") to act as agent or sub-agent for an underwriting member as to the whole or any part of his underwriting business in any case where such member has no underwriting agent for the whole or such part of his underwriting business or where in the opinion of the Council:

(a) such appointment is in the interests of such member; or

C (b) it is essential for the proper regulation of the business of insurance at Lloyd's;

and to give such directions to any underwriting agent already acting for such member as may be desirable in connection with the appointment of the substitute agent . . .'

D In 1983 the council passed Byelaw No. 20 of 1983—the Substitute Agents Byelaw ('SAB') which empowered the council to appoint a substitute agent in certain circumstances and to give such directions as it considered appropriate to such agent. It provided as follows:

'1. The Council may, at its sole discretion, appoint a specified person to act as agent or sub-agent (a "Substitute Agent") for any underwriting member of the Society as to the whole or any part of that member's underwriting business:

E (a) where such member has no underwriting agent for the whole or such part of his underwriting business; or

(b) where in the opinion of the Council:

(i) such appointment is in the interests of such member; or

(ii) it is essential for the proper regulation of the business of insurance at
F Lloyd's.'

It further provided:

'2. Where a Substitute Agent is appointed pursuant to this byelaw, the Council may give such directions as it considers appropriate . . . in connection with the appointment of the Substitute Agent and the continuation of the agency business of the Prior Underwriting Agent or concerning the underwriting business of any
G member of the Society, and in particular without prejudice to the generality of the foregoing may direct that:

(a) the Substitute Agent, or any director, partner, agent or employee thereof, be empowered to conduct the agency business of the Prior Underwriting Agent either totally or in part; . . .'

Paragraph 3 provided:

H '3. Where a Substitute Agent is appointed pursuant to this byelaw, the Council may:

(a) give such directions to any member of the Society, any Lloyd's adviser, any Lloyd's broker, any underwriting agent, any director agent or employee of a corporate member, partner, agent or employee of a Lloyd's adviser, a Lloyd's broker or an underwriting agent as the Council may consider

appropriate in connection with the appointment of the Substitute Agent and the continuation of the agency business of the Prior Underwriting Agent or concerning the underwriting business of any member of the Society or for the protection of any Lloyd's policy holder, the Society, any member of the Society, any Lloyd's adviser, any Lloyd's broker, any underwriting agent or any other person doing business at Lloyd's.' A

Byelaw No. 82 of 1995, the Reconstruction and Renewal Byelaw, was passed to enable the council to put into effect R & R. It included at para. 4 the following provisions: B

'1. Subject to the following provisions of this paragraph, the Council:

(a) may direct members of the Society to enter into reinsurance contracts with Equitas with respect to such liabilities, for such premium to be paid or other consideration to be provided to Equitas, and generally on such terms, as shall be specified, provided or referred to in offers made by Equitas to the members concerned under the Equitas Scheme; C

(b) may direct any underwriting agent for the time being acting as such on behalf of a member of he Society to whom such a direction as is referred to in sub-paragraph (1)(a) is given to enter on behalf of that member into the reinsurance contract specified in that direction;

(c) may direct any underwriting agent for the time being acting as such on behalf of a former member of the Society who remains subject to liabilities to which the Equitas Scheme relates to enter on behalf of such former member into reinsurance contracts with Equitas with respect to such liabilities, for such premium to be paid or other consideration to be provided to Equitas and generally on such terms as shall be specified or referred to in any offer made by Equitas to that underwriting agent on behalf of the former member concerned under the Equitas Scheme; . . .' D E

By para. 6 the council was given wide powers to give the names or other Lloyd's persons 'such directions as may appear to the council to be desirable or expedient' for giving effect to the Equitas Scheme.

By a Resolution and Directions of 3 September 1996 the council appointed Additional Underwriting Agencies (No.9) Ltd ('AUA9'), a company owned indirectly and controlled by Lloyd's, to act as substitute agent for all names in respect of the 1992 and prior years non-life business including that part of the 1993 and later years syndicates' business which consisted of 1992 and prior years business. The authority of all the prior underwriting agents in respect of those years was revoked. The substitute agent, AUA9, was directed to do all things necessary to put into effect R & R including: F

'. . . to execute the Reinsurance Contract for itself and on behalf of the Members in such form as the council may direct and to undertake all obligations of the Substitute Agent under the Reinsurance Contract or the R & R Completion Agreement and to perform all functions necessary therefore or incidental thereto; . . .' G

Thus Lloyd's put into effect R & R, including the Equitas Scheme, applying the scheme to all underwriting members of Lloyd's for 1992 and prior years and, in respect of that business, substituted for the various managing agents and underwriting agents with whom the names had agency agreements the substitute agent AUA9, which was directed to enter into the reinsurance contract with Equitas on behalf of all such names and to, H

'do all such acts and things . . . as may from time to time appear to the Substitute Agent to be requisite or expedient for the purposes or in connection with the implementation (of R & R) . . . including the Reinsurance Contract, the R & R Completion Agreement and the arrangements made by Lloyd's for the collection

A and delivery of money . . . for the purposes of settlement of amounts payable under or in connection with R & R.'

Thus, on the face of it, Lloyd's had appointed AUA9 to enter into the Equitas reinsurance contract on behalf of all the names and to pay the premium on behalf of all the names, regardless of whether they had accepted R & R.

B **Resistance by the defendants to R & R**

These defendants did not accept R & R. Indeed they positively objected to it.

(1) *Mr Leighs*

Thus, on 18 December Mr Leighs sent letters to the managing agents of syndicates 108 and 105 stating that they had no authority to enter into R & R on his behalf or to hand C over management to Equitas. On the same day he wrote to the chairman of Lloyd's and to the chairman of Equitas stating that he had written to the agents informing them that they must not hold themselves out as representing him in any way in matters concerning Equitas.

On 3 May 1996 he wrote to Lloyd's, to Equitas and to his agents informing them inter alia that:

D '. . . neither yourselves as my Agent nor any substitute Lloyd's appoints has any authority to commit me to Equitas without my previous written consent.'

Following the execution of the reinsurance contract by AUA9 and Equitas on 3 September 1996, Dibb Lupton Alsop, acting for Lloyd's, by letter dated 1 October 1996 gave notice to Mr Leighs that on 4 September 1996 he had become liable to pay his premium under the reinsurance contract, which amounted to £30,334 less credits at Lloyd's giving a net figure due of £29,031. It called for payment in seven days. E The letter also stated that the right to recover the outstanding amount had been assigned to Lloyd's. It is common ground that the assignment took place on the following day, 2 October 1996.

On 2 October 1996 Equitas gave notice by letter to AUA9 that it had assigned the premium due to it under the reinsurance contract to Lloyd's.

F (2) *Mr Wilkinson*

On 12 December 1995 Mr Wilkinson wrote to Lloyd's Members' Agents Services Ltd ('LMAS') asking them to instruct all managing agents conducting business on his behalf that they had 'no authority to sign a Supervisory/Management Agreement with Equitas or take any other step committing (him) to Equitas on (his) behalf'.

On 15 December 1995 Epstein Grower & Michael Freeman, the defendants' solicitors, G wrote to LMAS arguing that Equitas could not be imposed on names, who had ceased underwriting, without their agreement and requesting that LMAS should inform each of the managing agents and run off agents that they had no authority to enter into the Supervisory Management Agreement with Equitas without written authority from each name.

On 1 October 1996 Dibb Lupton Alsop on behalf of Lloyd's wrote to Mr Wilkinson the standard letter informing him that the Equitas premium which had become due for H payment on 4 September had been assigned by Equitas to Lloyd's and calling on him to pay £165,785 within seven days.

(3) *Mr Lyon*

Due to ill health between September 1996 and January 1997 Mr Lyon has not had access to his documents which are at his home in Spain while he has been under medical

care in England. He adopts for present purposes the arguments advanced on behalf of Mr Leighs and Mr Wilkinson on the group (1) and (2) defences. There appears to be no material difference on the facts affecting him by comparison with those affecting the other two defendants. A

**The group (1) defences**

The defendants' submissions may be outlined as follows: B

(1) *Want of authority of AUA9*

(a) At the time when on 3 September 1996 AUA9 was appointed to act as substitute agent for all names in respect of 1992 and prior years and for all subsequent years in so far as they had reinsured under the reinsurance to close 1992 and prior years business the defendants had already given notice to their respective underwriting and managing agents that they had no authority to enter into any contract with Equitas. C

(b) AUA9 could therefore have no greater authority to contract with Equitas than that to which it succeeded on appointment.

(c) The 3 September 1996 Resolution and Directions did not therefore have the effect of clothing AUA9 with authority to enter into the reinsurance contract with Equitas on behalf of the defendants or to administer monetary collections for the purposes of R & R on their behalf. D

(d) Consequently the defendants were not parties to the reinsurance contract and were not indebted to Equitas or, by way of assignment, to Lloyd's in respect of the Equitas premium.

(2) *The Equitas Scheme could not validly be imposed on non-accepting names and they are not bound by it or it should not be enforced against them.* E

(a) Lloyd's power to amend, revoke or enact byelaws or give directions must be subject to the following constraints:

(i) the byelaw or directions must be within the objects defined by the *Lloyd's Act* 1911;

(ii) the byelaw or directions must not change the scope of the venture; F

(iii) the byelaw or directions must be reasonable in the sense analogous to the public law concept of reasonableness under *Associated Provincial Picture Houses Ltd v Wednesbury Corp* [1948] 1 KB 223.

(b) The introduction of the Equitas Scheme is outside the scope of the venture entered into by each name when joining Lloyd's.

(c) The following features of underwriting business at Lloyd's, as they existed when the defendants became members and before the introduction of R & R, were fundamental features of the venture as between the names of Lloyd's: G

(i) the principal of several liability enshrined in s. 8 of the *Lloyd's Act* 1982;

(ii) the management of underwriting names' affairs by underwriting agents who owed obligations of the care and skill and fiduciary duties to names; H

(iii) the three year accruing system and the reinsurance by each syndicate of each underwriting year into the next succeeding year under the reinsurance to close ('RITC') at the end of the third year in exchange for a premium transferred from the earlier reinsured to the later reinsuring years save only where outstanding liabilities, including IBNRs, could not be estimated with a reasonable degree of accuracy;

© 1997 CCH Editions Limited

A

(iv) the monitoring of the names' liabilities and in particular the premium to be transferred for the succeeding years on the RITC.

(d) The Equitas Scheme has involved fundamental departures from each of these basic features of the venture in the following respects:

(i) Management of all names' 1992 and prior business has been transferred out of the hands of the names' managing agents or run-off agents which have been separately appointed in respect of each syndicate and into the hands of a global agency (AUA9) or of Equitas itself.

B

(ii) Control of the conduct of the run-off of each open year syndicate has been transferred from the separate managing agencies for each such syndicate to Equitas which now manages on a centralised basis the 1992 and prior year claims which would otherwise have been separately managed by the managing agents. This centralisation will involve conflicts of interest in the course of collecting or disputing recoveries by Equitas from reinsurers of the syndicates. These are considered in a report prepared by Mr A J South on the instructions of the defendants, but they have not been investigated in any detail in the course of the hearing before me because Lloyd's have concentrated on a more fundamental attack on the defendants' submissions.

C

D

(iii) Management of the reinsurance of the individual syndicates' liabilities and the closure of the years of account in respect of 1992 and prior years was taken out of the hands of the individual managing agents in as much as the Equitas Scheme involved determination of the terms of reinsurance by Lloyd's and the Reserve Group and such terms were mandatory and global and not open to negotiation.

E

(iv) Reinsurance and run-off management are combined under the Equitas Scheme in one body, namely Equitas.

(v) Although the Equitas Scheme has been described as analogous to a reinsurance to close, it lacks the audit and underwriting controls which would have been exercised under an ordinary reinsurance to close. In particular, the premium was imposed on names even where the syndicate underwriter had left open years of account because they considered future development too uncertain fairly to calculate the RITC premium. Further, there was to be no monitoring or approval by syndicate auditors of the Equitas premium, the value of names' reserves transferred to Equitas or the results of syndicates following reinsurance into Equitas. In this connection it is maintained by the defendants on the basis of Mr South's report that the IBNR of £900m imposed on all syndicates was arbitrary and bore little if any relation to individual syndicate's actual future liabilities.

F

G

(vi) Equitas was fundamentally inconsistent with the principal of several liability of underwriting names. This is because under the normal Lloyd's system reserves would be established for each syndicate by its own managing agents for the purpose of meeting the outstanding liabilities of the members of that syndicate. The reserves have now been valued by Lloyd's and Equitas and transferred under the terms of the reinsurance contract to be held in a pool to meet the claims against all the rest of the market. The defendants say that this is tantamount to mutualisation. As recognised in the SOD at p. 144, the pooling of assets is not accompanied by a pooling of liabilities and if there were eventually to be a shortfall of the assets of Equitas against the names' liabilities, that shortfall would be borne rateably across the entire book of business. Thus particularly where long-tail exposure was involved it could happen that Equitas ran out of funds in satisfying other shorter tail claims

H



agent.

(g) AUA9 was not validly appointed under the Subsitute Agents Byelaw ('SAB') because:

upon other names before claims were made in the long-tail cases and in that event some names might still remain exposed. Mr Charles Falconer QC, for the Canadian names, emphasises the difference between the position as to risk of a name on an underwriting year 1992 or prior before and after the introduction of the Equitas Scheme. In particular, the risk that his exposure under policies written by his active underwriter and as protected by reinsurances selected by his managing agent will exceed his own personal reserves has been replaced, by reason of the amalgamation of the entire market's assets and further funds into Equitas and the global reinsurance provided by Equitas, by one large fund and the success or failure of the protection depends on the performance of the risks written by the entire non-life market relative to the assets and other funds from the entire market. That, he submits, involves mutualisation inconsistent with the original scope of the venture.

(vii) The Equitas Scheme involved setting aside closed years of account which had been reinsured into the 1993 and subsequent years of account to the effect that the RITC in respect of those years was discarded and the 1993 and prior years business was isolated and reinsured into Equitas regardless of the terms of those RITCs which had previously been worked out by underwriters and approved by syndicate auditors.

(e) The R & R does not satisfy the requirement of reasonableness in so far as it imposes the Equitas Scheme on names who have not accepted R & R for the following reasons.

(i) It would have the effect of imposing on names without their consent a scheme which was outside the scope of the venture.

(ii) Equitas premium is arbitrary in amount and has been fixed where it has been considered that reserving for the underwriting year in question is too uncertain to effect a fair reinsurance to close.

(iii) The imposition of a general IBNR of £900m imposed upon all syndicates could not be justified on any rational basis.

(iv) The Equitas premium could not be calculated with proper regard to the impact of the level of acceptances of R & R in reducing the liabilities of syndicates writing personal stop loss insurance.

(v) The actuarial report by Tillinghast-Towers Perrin which appears at appendix 4 of SOD makes it clear at p. 3 that their conclusions were based on data supplied by Lloyd's which 'in many cases' they were informed could not formally be relied upon by them or by Lloyd's. They stated that their engagement did not include audit or independent verification of that data and information and that their conclusions 'depend heavily on the accuracy of this data and information'.

(vi) The defendants maintain that, based on Mr South's report, the incidence of the cost of the Equitas premium is arbitrary and unfair because the methodology underlying it favours syndicates still underwriting as distinct from those which have ceased to trade. All three defendants belonged to syndicates which were in run off.

(vii) By means of Lioncover Lloyd's had taken over all the outstanding liabilities of the notorious PCW Syndicate and those liabilities were also to be reinsured by Equitas. However, it is said that the estimation of those liabilities was inherently impossible, not only because they were very long tail, but also because of the complexities of the reinsurance protections.

© 1997 CCH Editions Limited

A Further, it is said that in as much as Lloyd's in effect set the premium by which its own Lioncover liabilities would be reinsured by Equitas, there was a conflict of interest between Lloyd's on the one hand and the names on the other hand.

(viii) Lloyd's never attempted to obtain an external quotation for the provision of any part of the reinsurance cover provided by Equitas.

B (ix) Lloyd's has not demonstrated that the Equitas premium has been fair or fairly assessed and has declined to provide to names generally or to these defendants any underlying data or further information beyond the contents of SOD and what is available in the defendants' syndicate accounts.

(f) Lloyd's is precluded from claiming the Equitas premium because:

C (i) it owed a fiduciary duty to the defendants as regulator of the market and as in substance their substitute managing agent, in as much as Lloyd's appointed AUA9 and controlled it;

(ii) as a fiduciary Lloyd's was precluded from entering into any transaction binding on the defendant names which was to its benefit unless there had previously been full disclosure of that benefit to the names and specific consent by the defendant names to the transaction in question with D knowledge of the full facts;

(iii) some of the terms of the reinsurance contract entered into by AUA9 with Equitas were plainly against the defendants' interests and solely beneficial to Lloyd's;

(iv) these terms were: cl. 5.5 which provided that each name was obliged to and would pay his names premium in all respects free and clear from any set-off E counterclaim or other deduction on any account whatsoever, including in respect of any claim against Lloyd's and which also provided amongst other things for a waiver by the name of any claim to a stay of execution on the judgment; and cl. 5.8 by which each name agreed that Equitas had power to assign its right to receive premium and to enforce claims for premium and to give notice to the substitute agent (AUA9) on behalf of names;

F (v) cl. 5.5 was unnecessary, unfair and unreasonable in the context of those names who did not accept R & R in as much as they might well be contemplating actions against Lloyd's and they would be prevented from setting off those claims against their liability to pay premium in respect of a scheme which they had never accepted;

(vi) cl. 5.8 was also unnecessary, unfair and unreasonable for non-accepting G names in as much as it would be known by Lloyd's that AUA9 would not pass on that notice to the names, there being no mechanism for such notice to be given;

(vii) although appointed substitute managing agent, AUA9 was required by the September 1996 Resolution and Directions to enter into the reinsurance contract without forming any independent judgment as to the suitability of H the assigned reinsurance for the name, as would have been its duty as managing agent under cl. 4.2 of the Managing Agents Agreement, and the reinsurance contract was therefore imposed and the premiums assigned without the names having the benefit of any independent advice from an agent.

(g) AUA9 was not validly appointed under the Substitute Agents Byelaw ('SAB') because:

(i) it was not in the interests of the defendant names and it was not essential for the proper regulation of the business of insurance at Lloyd's within the meaning of para. 1(b) of the SAB; A

(ii) the SAB gave no power to appoint a substitute managing on a global basis for a purpose such as that of AUA9 which was entirely outside the ordinarily or contemplated function of a managing agent at Lloyd's;

(iii) as to its being in the interests of the defendant names, (a) the defendants' case is that they are entitled to rescind their membership of Lloyd's due to fraud and to claim damages against it; (b) the Equitas premium was arbitrary and unfair and cannot be shown to be otherwise; (c) the defendants and their managing agents and substitute agent were deprived of the opportunity of independent evaluation of the Equitas reinsurance contract; (d) the Equitas Scheme was outside the scope of the venture to which the defendants were parties as underwriting members of Lloyd's and (e) under SAB para. 1(b) the appointment of a substitute agent has to be in the interests of each underwriting member and not merely of the whole market; B C

(iv) as to the appointment of AUA9 not being essential for the regulation of the business of insurance at Lloyd's within the meaning of para. 1(b) of SAB, the appointment of AUA9 was for the commercial purpose of giving effect to the Equitas Scheme and R & R and not for the purpose of regulation, as when a previous managing agent has become insolvent and it was in any event unnecessary to appoint a global substitute for that purpose. D

In addition to these points Mr Falconer, on behalf of the intervenors, puts forward the submission that the R & R scheme was an abuse of Lloyd's legislative power on the grounds of *Wednesbury* irrationality because the SOD did not put forward sufficient information to the members. In particular, members were not told how the total Equitas premium of £14.7 billion was calculated. Nor were they told how that premium was distributed amongst syndicates. Nor were they told the basis on which assets had been transferred. No reasonable regulatory body in the position of Lloyd's would have imposed such a scheme without first providing the members with information on those matters. Mr Falconer relied on passages in De Smith, *Administrative Law*, p. 464, including the following: E F

> 'It is submitted that it is preferable not to attempt to separate out the different grounds on which a duty to give reasons may arise; rather, there is a "unitary test" which rests on familiar considerations of fairness; within such a test, regard may be had, where appropriate, to the multiple grounds which may exist, such as a need for reasons to know whether to challenge the decision (by appeal or judicial review); the importance of the decision on the individual's liberty or livelihood; the advantage of concentrating the decision-maker's mind and ensuring that the issues have been conscientiously addressed, the general nature of the adjudicating process . . .' G

**The group (2) defence: Lloyd's title to sue**

The defendants submit that no effective notice of assignment of the premium has been given to the defendants for two reasons: H

(1) Dibb Lupton Alsop's letter of 1 October in respect of an assignment which, it is common ground, took place the following day. Accordingly, it was not valid notice of assignment for the purposes of the *Law of Property Act* 1925, s. 136, and therefore there was no legal assignment based on this notice.

© 1997 CCH Editions Limited

A (2) The notice of assignment of the premium given on 2 October 1996 by Equitas to AUA9 was invalid for the purposes of s. 136 because AUA9 had not been validly appointed as substitute managing agent and was in any event ineffective because Lloyd's knew that it would never be given to the names.

The defendants submit that in the absence of a legal assignment Lloyd's cannot sue for the premium in its own name. Only Equitas can sue.

B I must now deal with each of the defences relied upon. In so doing, it will not be necessary to consider each one of the underlying points in support of those defences, having regard to the principles which must, in my judgment, be applicable. I shall, however, consider some of the more far-reaching points argued.

**Want of authority of AUA9**

C The foundation of this point is that the effect of the defendants' letters to their managing agents or run-off agents or Equitas by which they sought to withdraw the agents' authority to enter into any transaction with Equitas on behalf of the defendants operated in law so as to prevent those agents or their substitutes from binding the defendants to the reinsurance contract. The express authority to enter into reinsurance contracts and the reinsurance to close contained in cl. 5(a), (c) and (d) of the Managing Agents Agreement was thus withdrawn in so far as concerned the Equitas Scheme. The D defendants distinguish between the concept of authority given to an agent on the one hand which is not generally irrevocable and the contract of agency by which that authority is given, which may be broken by the revocation of authority: cf. *Bowstead & Reynolds on Agency* (16th edn), para. 10-007 and 10-021. They argue, by reference to *Smart v Sandars* (1848) 5 CB 895, that, unless the authority of an agent is given for the purpose of being a security or part of a security or for protecting a security interest of the agent, such authority can always be terminated by the principal. Consequently, it is said E that an underwriting name could divest the managing agent of authority except in matters of day-to-day management and control of the name's underwriting which are the only matters covered by cl. 7.3 of the Managing Agents' Agreement. That provision is in the following terms:

> 'The Name acknowledges that he has delegated to the Agent sole management and control of the Underwriting and that the Agent is not bound to comply with any F instructions or requests of the Name relating to the conduct of the Underwriting and undertakes that he will not in any way interfere with the exercise of such management or control.'

This provision on its proper construction expressly prevents the revocation of the agent's authority to act in all matters relating to the management and control of the underwriting. Unless, therefore, some overriding rule of law prevents its having that effect, the agent is expressly entitled to ignore interference by the syndicate member's G withdrawal of authority to bind him to outward reinsurances or any other contracts within the sphere of management and control of the syndicate.

Before examining the law, it is important to identify the function of cl. 7.3 within the machinery of the Lloyd's system. The essence of that machinery is the participation of the underwriting name in a specific syndicate on an annual basis and the delegation by the name to the managing agent of all decisions as to the conduct and management of H the business of underwriting in the course of that year for as long that business runs off.

There is therefore delegation to the managing agent of the conduct of the name's business of underwriting for a finite period of time on a syndicate basis. The name is not entitled prematurely to terminate his participation in that syndicate's business for that underwriting year or indeed to participate only to an extent which he from time to time selects. Nor is he entitled to manage his liabilities under policies to which he has become

party or to manage recoveries from reinsurers of his liabilities. The entire accounting system operates on a syndicate basis and is administered by the managing agent who in respect both of incoming and outgoing insurance was access (which the underwriting name does not) to the Lloyd's central accounting system. It follows that if individual names were in a position to obtain separate treatment from the rest of the syndicate, whether as to the conduct of underwriting or the obtaining of reinsurance protection, there would be fragmentation of the syndicate unit and the whole system would break down because it would be quite impossible to administer it.

The problems of syndicate fragmentation were fully discussed by Staughton J in *Daly v Lime Street Underwriting Agencies Ltd* (The Times, 8 June 1987). There the issue was whether a managing agent was authorised by an American name on his syndicate to pursue a RICO action for punitive damages in the US against the local holder of a binding authority. It is quite clear from the following passage from the judgment that the underlying assumption of both the judgment and of the plaintiff's counsel's submissions was that once Mr Daly had authorised the managing agent to recover syndicate losses by legal proceedings he could not withdraw the authority:

> 'Mr Boswood does not complain that it was improper for Mr Warrilow to bring a RICO action in this particular case. What he does say is that Mr Warrilow had and has no authority to bring it on behalf of Mr Daly. So the question is whether such authority was in fact conferred on Mr Warrilow irrevocably by the agreement which Mr Daly signed when he became a member of Lloyd's. If it was, Mr Boswood does not argue that it was terminated when Mr Daly's membership expired. It would be difficult to argue that, since former members remain, as I have explained, in point of form parties to contracts of insurance once concluded on their behalf, even though their financial interest in such contracts gradually disappears through the reinsurance-to-close procedure . . .
>
> Mr Daly says that he was never asked if the United States action could be commenced on his behalf. That is not surprising, in view of the evidence and the practice that I have described. What would have surprised me is if the 4,952 underwriting members had all be asked, though I suppose that the active underwriters of the other 12 syndicates involved may well have been consulted. There have been occasions in the past when the underwriting members of a syndicate have emerged from their backwoods and taken an active interest in its affairs. One example is the PCW affair. But they are rare, and justified by some special reason.
>
> I accept the argument of Mr Colman that the duty of the active underwriter is to conduct the affairs of the syndicate in good faith and in the manner which is beneficial to the syndicate as a whole; if that involves disadvantage to some members, it must be ignored; otherwise the interests of those members who would benefit and not be disadvantaged will suffer.'

I would only add, having appeared as counsel for the defendants, that Mr Daly had formally objected to the US proceedings before bringing his action for a declaration. In the event this issue was argued on the basis of the limited scope of the agent's authority and not on the basis of partial revocation.

The authorities, such as *Smart v Sandars* (above) for the proposition that the authority of an agent cannot be irrevocable unless it was granted in the first place for the purpose of protection of an interest in the nature of a security of the agent, are based on facts far different from those which I have outlined in relation to the conduct of business at Lloyd's. Many of them are concerned with agents, like the factor in *Smart v Sandars*, who are appointed to sell goods or to conduct other activities for the principal in consideration of remuneration by reference to the sale or activity and the issue which the

© 1997 CCH Editions Limited

A courts have had to determine is whether the principal can withdraw authority before the agent has completed his mandate. In that context it can easily be seen that two considerations are likely to be highly material:

(i) the performance of the mandate being the consideration for the agent's remuneration;

B (ii) the similarity between that kind of principal and agent relationship and the relationship of master and servant.

Thus, in *Smart v Sanders*, Wilde CJ makes the point at p. 916 that:

> 'Such an authority requires no consideration to support it. An authority is, in its nature, revocable by the donor of it: *Vynior's* case . . . it is only when it is sought to make it irrevocable, that a consideration is required to give it that effect.'

C On the facts of that case the factor who sold the goods after revocation of his authority was trying to justify the sale on the basis that he had made a loan to the principal and that as long as the debt was outstanding his authority to sell the goods and thereby recoup the debt could not be revoked. The court was thus concerned with the absence of the agents' security interest in the goods in his possession. Absent any such interest, there was a bare authority to sell unsupported by consideration. It was against that background that the court went on to consider the cases where it had been held, notably D by Lord Kenyon in *Walsh v Whitcomb* (1797) 2 Esp NPC 565, that a power of attorney could be irrevocable if given for the purpose of or as part of a security for money for the benefit of the donee. The judgment continues:

> 'and the result appears to be, that, where an agreement is entered into on a sufficient consideration, whereby an authority is given for the purpose of securing some benefit to the donee of the authority, such an authority is irrevocable. This is E what is usually meant by an authority coupled with an interest, and which is commonly said to be irrevocable.
>
> But we think this doctrine applies only to cases where the authority is given for the purpose of being a security, or, as Lord *Kenyon* expresses it, as a part of the security; not to cases where the authority is given independently, and the interest of the donee of the authority arises afterwards, and incidentally only. As for F instance, in the present case, as disclosed by the 13th plea, the goods are consigned to a factor for sale. That confers an implied authority to sell. Afterwards, the factor makes advances. This is not an authority coupled with an interest; but an independent authority, and an interest subsequently arising. The making of such an advance may be a good consideration for an agreement that the authority to sell shall be no longer revocable; but such an effect will not, we think, arise independently of agreement. There is no authority or principle in our law, that we G are aware of, which leads us to think it will.'

Read in its context and particularly having regard to the very limited previous judicial authority on which it was based, it is, in my view, quite impossible to treat this case as laying down any inflexible principle to the effect that nothing less than a security interest can justify the irrevocability of an agent's authority. No doubt agencies will not normally be irrevocable, because in the nature of the transaction the consideration given by the H agent would not have purchased the *relationship* but merely the agents' entitlement to be paid his commission in relation to performance. Furthermore, there is a close similarity to the master and servant relationship and, as the editors of *Bowstead & Reynolds* points out at para. 10-021, the common law rule that a servant could always be dismissed is one of policy. However, there cannot be any conceptual basis for confining irrevocability of the authority of an agent to cases where the purpose of his authority is to secure his money interest. In the authorities under discussion the purpose of preventing the

revocation of the agents' authority is that the perpetuation of the authority is necessary to provide the agent with a means which is under his control of ensuring that some obligation of the principal for the benefit of the agent is performed. The inability of the principal to withdraw authority is what ensures that the principal will not be able to avoid satisfying his contractual obligations. A

When an underwriting name joins a particular syndicate he enters into a transaction which entitles him to make available part of his underwriting capacity to that syndicate as a co-participant with the other syndicate members and to receive the benefit of the management of that syndicate for the underwriting year in question. Performance of his obligations as a syndicate member would clearly be ensured if the managing agent irrevocably controlled his underwriting business. If he did not, the individual name could disrupt the working of the syndicate and therefore of the agent's business as the manager of a market trading unit with management responsibilities to all the syndicate members. To protect this interest the irrevocability of the agent's authority is manifestly essential. I have no doubt that this purpose is sufficiently similar to the security interest in the old cases to which I have referred to justify contractually imposing irrevocability on the authority given to a managing agent at Lloyd's. There can be no problem about consideration because the managing agent promises to be responsible for the conduct of the names' whole business from the beginning of the year of account until completion of the run-off and he is not remunerated on a transaction-by-transaction basis. B C

I therefore conclude that as a matter of law the defendants could not withdraw the authority of their existing managing agents and run-off agents to enter into a future reinsurance contract which had the effect of reinsuring the 1992 and prior years. It follows that when AUA9 was appointed as substitute managing agent on 3rd September 1996, it did not succeed to an authority vis-à-vis these defendants which was subject to any constraint as regards entering into the Equitas reinsurance contract. Nor could the name withdraw such authority from AUA9 by giving notice to it or to Equitas. D E

Since each of the defendants was under an obligation to Lloyd's under the general undertaking to comply with the byelaws and the resolutions and directions of the council, they were in any event bound to accept that they had been made parties to the Equitas reinsurance contract having regard to the R & R byelaw of 1995 and to the council's resolution and direction of 3 September 1996 unless that internal legislation was ultra vires the council. To that point I must now turn. F

**The scope of the venture point**

Before considering the authorities on this point, it is important to understand the circumstances in which Lloyd's introduced R & R, including the Equitas Scheme. There is no doubt on the evidence that, but for a global run-off reinsurance of the 1992 and prior underwriting years and of that part of the business of subsequent years as consisted of the reinsurance of those earlier years, the probability is that the entire Lloyd's market would have to be put into run-off. The resources of many of the members would be inadequate to meet incurred and yet-to-be incurred future losses and the resources of Lloyd's Central Fund itself, as distinct from its underwriting members, would be inadequate to meet the shortfall upon the members' failure to satisfy their obligations. In these circumstances new business could not be permitted because neither in this country nor in the US, from where more than half the business of Lloyd's emanates, would the regulatory authorities have been prepared to permit continuing business. G H

Moreover, Lloyd's perceived the probability that in the event of run-off, defaulting reinsurances within the Lloyd's market would cause the losses of individual names to escalate. Overall there would probably be increased total liabilities as well as an acceleration of demands for payment on names. This would include names on profitable

© 1997 CCH Editions Limited

A syndicates with proper reserves. In consequence, names would be locked into their syndicates until they had satisfied all their liabilities. In general, to put the market into run-off would be likely to be acutely damaging to a very large proportion of Lloyd's names. In May 1995 the council concluded that, unless decisive action was taken, the resources of the central fund might be exhausted before the end of 1996. Because certain names maintained that the advantages of putting Lloyd's into run-off exceeded the
B advantages of the continuation of Lloyd's under a run-off reinsurance scheme, the Validation Steering Group was set up in October 1995 under the chairmanship of Sir David Berriman, representing the Association of Lloyd's Members, and including representatives of the Litigating Names Committee and the Lloyd's Names Association's Working Party. Its function was to obtain independent verification of the council's view that the R & R solution offered substantial advantages over the alternatives. This resulted in an independent review by Slaughter & May of the R & R plan by comparison with
C run-off. That review, published in April 1996, expressed the view none of the alternatives to R & R was preferable to R & R and,

> 'In short, if Lloyd's goes into run-off, we think it unlikely that any section of the Lloyd's community will be better off.'

In the event the R & R solution was developed in close consultation with the Department of Trade and Industry and the US regulatory authorities. Indeed, the
D approval of the DTI for Equitas to act as reinsurer was a specific requirement of the entire scheme.

The reason why Lloyd's decided to appoint a substitute agent to bind all names to the Equitas reinsurance contract, including those names who had not accepted R & R is explained by Mr Ronald Sandler, chief executive of Lloyd's, in his second affidavit in these words:

E
> '(i) Reinsurance, including the annual reinsurance to close, has always been on a syndicate basis and can only work if all Names on the relevant syndicate are bound into the reinsurance. Extreme practical difficulties would have arisen in the settlement of claims if only some of the underwriting Names on a policy had been reinsured into Equitas.
>
> (ii) The Council understood that the DTI would need to be satisfied that all
F Names would be bound by the Equitas Reinsurance Contract before it would authorise Equitas.
>
> (iii) Reinsuring all Names helped to create the "firebreak". The need to create a "firebreak" (to ensure that the future market was as free as possible from the risks of past underwriting) was central to the Reconstruction and Renewal plan. Without a firebreak, the future market would not have been commercially viable and would not have been prepared to fund
G Reconstruction and Renewal or have been in a state to enable Lloyd's to raise bank finance for this purpose. Without that finance and the funding from the future market, which exceeded £1 billion, the Reconstruction and Renewal plan would not have been possible.
>
> 29. It was therefore, essential for all Names to be reinsured into Equitas. In these circumstances, it would not have been fair, as between Names, for non-accepting
H Names to "free-ride" by receiving the benefit of reinsurance into Equitas without paying their share of the cost. Should such a "free-riding" option have been available, the prospect of a market-wide vote in favour of the Reconstruction and Renewal plan would have been imperilled.
>
> 30. From late 1995 and during 1996, it became evident that some Names opposed to the Reconstruction and Renewal plan would seek to disrupt the process. A

significant number of Names, covering a significant number of syndicates and years of account, purported to withdraw their managing agents' authority to enter into the Equitas Reinsurance Contract on their behalf. This presented a potential obstacle to the successful implementation of the Reconstruction and Renewal plan. A

31. Lloyd's considered that this purported withdrawal of authority was ineffective, but decided that the issue could not be regarded as being sufficiently clear to enable Lloyd's, in the circumstances, to rely on the agents concerned to enter into the Equitas Reinsurance Contract on behalf of those Names. In any event, whatever the legal position, agents may have been unwilling to do so when faced with conflicting instructions from the Name and Lloyd's. Furthermore, in the light of the number of purported revocations that were being sent, it would not have been possible, without considerable administrative difficulty and delay, to determine the identity of all the Names that had purported to revoke their agents' authority and then to appoint a substitute agent in respect of those Names only. B C

32. Accordingly, and in order to achieve legal certainty, Lloyd's decided to seek an independent legal basis for the execution of the Equitas Reinsurance Contract on behalf of all Names, that is to say, one that was not dependent upon the authority of the original managing agents.'

The council therefore resolved to use the Substitute Agents Byelaw because the use of a substitute agent, as Mr Sandler deposes: D

'(i) was essential for the proper regulation of the business of insurance at Lloyd's;

(ii) in relation to some Names was also necessary because those Names might not have an underwriting agent for the whole or part of their business;

(iii) was in the interests of Names on closed years of account.' E

As regards the setting of the Equitas premium, Mr Sandler explains in his second affidavit the wide-ranging consultative processes which Lloyd's employed. The calculation of reserves for long trail business is a matter of a great difficulty on which even professional views can differ. The essential requirement is to select an appropriate methodology for projecting claims, but there may be types of business, particularly LMX spiral business, in relation to which it was appreciated by 1995–96 that no known methodology could be used to project claims with any real confidence. Accordingly, any global run-off reinsurance was going to involve intricate, difficult and to some extent imprecise analysis. Lloyd's embarked upon an investigation of the required reserves. which is described by Mr Sandler in the following passage from his second affidavit. F

'37. In setting the Equitas premium, one of Lloyd's principal objectives was to ensure that Equitas was reserved on the basis of the best estimate of its future obligations. The reserving project was a massive exercise which took approximately two and a half years and which involved several hundred people. The project involved a dedicated team working within Lloyd's made up of employees of, and secondees to, Lloyd's with relevant actuarial, accounting and other experience. Where appropriate, advice and detailed work on specific areas of the reserving analysis was provided by leading external consultants, including most of the leading accountancy firms and consulting actuaries. This work was supervised and reviewed by what was known as the "Reserve Group", who provided market input in developing appropriate methodologies to establish common reserving approaches across syndicates. The members of the Reserve Group comprised leading Lloyd's market practitioners with extensive knowledge of the different types of business that were being reinsured. G H

38. In addition, between November 1995 and May 1996, an extensive consultation

© 1997 CCH Editions Limited

A exercise was carried out during which managing agents and their advisers were given an opportunity to review and comment upon the methodologies used and the calculations made to establish the reserves needed for each syndicate year of account.

39. Lloyd's engaged Tillinghast, a leading firm of consulting actuaries, to analyse whether the processes used by the reserving project were reasonable for the
B purposes of producing a "best estimate". Tillinghast concluded that the processes were reasonable and that the methods and assumptions used were appropriate in relation to the stated objective of providing a best estimate. Tillinghast's report was reviewed by Lazards, financial advisers to the Council. Lazards concluded that, from a financial point of view, the decision of the Council that the Reconstruction and Renewal plan was in the best interests of the Society was reasonable and reached after careful enquiry.'

C Mr Sandler also states that the DTI had to be satisfied by the reserving exercise and that it was advised in this respect by the Government Actuary's Department.

The conclusion can therefore be drawn with some confidence, in spite of Mr Smith's comments, that Lloyd's fully appreciated the need to arrive at a fair and realistic premium, having regard both to the need to achieve reinsurance protection and the fair treatment of all names.

D It is against this background that I turn to the defendants' argument that the imposition of the Equitas Scheme on the non-assenting names involved a course which was outside the scope of the venture. The authority upon which both Mr Tager and Mr Falconer primarily rely as that which identifies the relevant principles is *Hole v Garnsey* [1930] AC 472.

E **The decision in Hole v Garnsey**

The issue in that case was whether a society registered under the *Industrial and Provident Societies Act* 1893 could, by a properly-voted change in its rules, impose an increase in the capital to which a member was liable to contribute on a member who did not assent to that rule-change. The effect of the rule-change was to replenish the agricultural society's capital in the face of heavy losses sustained in the course of its
F previous trading activities, partly by imposing upon those former members who were milk producers a greater capital obligation than that imposed on the other members. The effect therefore was that a milk producer who had become a member of the society on the basis that his capital contribution was fixed at a certain maximum was subjected to an increased capital contribution in the course of membership.

In allowing the appeal by a majority of 4 to 1 (Lord Buckmaster dissenting on the separate point whether the House was bound by an earlier decision), the House of Lords
G held that, although the new rule had been properly voted and was not contrary to any express provision of the rules or the Act, it was inconsistent with the contract which the member had entered into on joining the society that the power to amend the rules could later be used to change the capital liability of the member.

Viscount Dunedin observed at p. 487 that, in view of the fact that if the power to increase the member's capital liability existed it must be a power to increase it by an
H unlimited amount, the power was too vague to be enforced and 'bad at common law'. At the end of his speech he described the rule change as one 'which did not simply affect the rights of the member in the capital of the society, but imposed a perfectly new and outside liability upon him'.

Lord Tomlin at p. 500 said this:

'In the case of a registered society, inasmuch as the operation of the statute is

limited, it is necessary to consider, first, whether the amendments offend against any of the statutory provisions and, secondly, whether, having regard to the general principles governing contracts inter partes, the amendments are effective as against members who have not assented to them.

An examination of the relevant amendments in the present case does not in my opinion disclose anything obnoxious to the statute. If the amendments had stood as part of the original rules they could not I think have been impeached, and from the point of view of the statute that which would be innocent as an original rule cannot be invalidated merely because it is embodied in an amendment.

There is however the second consideration. Does a power enabling a majority to amend the rules justify as against a dissenting member any alteration whatever, where, as here, neither by the statute nor by the rules themselves, is any one rule expressed to be more fundamental and unalterable than any other?

The answer in my judgment must be in the negative. In construing such a power as this, it must, I think, be confined to such amendments as can reasonably be considered to have been within the contemplation of the parties when the contract was made, having regard to the nature and circumstances of the contract. I do not base this conclusion upon any narrow construction of the word "amend" in rule 64, but upon a broad general principle applicable to all such powers.

If no such principle existed I see no reason why a dairy society in Wiltshire should not by means of the exercise of such a power as the one under consideration find itself converted into a boot manufacturing society in Leicester with an obligation on the members to contribute funds to the new enterprise.'

Later (at p. 501) he added:

'It is said that the society is free to reduce its capital and to increase its capital and that this is what it has done.

It has in fact done much more. It has discriminated between members and has laid on members an obligation to hold more shares. It has no special statutory authority to do this. It can only do it if the power to amend the rules justifies it as a matter of contract.

In my opinion, the power does not justify it. I do not think that it is within the contemplation of the parties to a bargain of this kind that they should be made liable for a compulsory levy or expenditure over and above the contributions payable or to become payable under the original terms. On the contrary I think the basis of such a bargain is that the extent of the member's liability is limited by the original terms and that it cannot be enlarged by any amendment of the rules.'

Lord Atkin agreed with both Viscount Dunedin and Lord Tomlin. His analysis is in substance identical to that of Lord Tomlin. Thus at p. 493 he said:

'Apart from any decision which binds your Lordships to the contrary view, I should have thought on principle that the matter was fairly plain. If a man enters into association with others for a business venture he commits himself to be bound by the decision of the majority of his associates on matters within the contemplated scope of the venture. But outside that scope he remains dominus, and cannot be bound against his will.'

He applied this principle at p. 496:

'The only relevant question in this case appears to me to be whether r. 64 giving the power to a three-fourths majority at a special general meeting to amend the rules confers a power to amend those rules in respect of the fundamentals above mentioned so as to bind a dissenting member. I think that the consent of a member

© 1997 CCH Editions Limited

A to such a rule as r. 64 is not an assent to have the purposes of the society or the amount of his share subscription altered against his will. Full effect is given to the rule by limiting its operation as against dissentients to matters which are within the scope of the administration of the venture as originally framed. I should myself regard as within this definition such matters as the annual subscription to a social or other club which may fairly be regarded as a matter of internal administration. But an increase in capital contribution is something quite different. I reserve the B question whether an amended rule so passed is ultra vires the society so as to be entirely void and therefore not binding on even the assenting majority. It may well be that a society under this Act can only express in rules what I may call offers of fundamental change, and that such rules so far as they are assented to, but only so far, bind assenting members.'

Lord Sumner devoted most of his speech to emphasising the intrinsic unfairness and C discriminatory nature of the rule-change. The substance of his speech is that such a change was outside the rule-change powers of the society. It is, however, significant that when rejecting the argument that certain of the cases on building societies and others on mutual marine insurance associations supported the conclusion of the Court of Appeal, he described those as 'cases of collateral undertakings ancillary to the regular business of the association and bearing equally upon all members': see p. 491.

D The distinction between the use of a rule-change for the purpose of changing the underlying scope or foundation of the venture and the use of a rule-change for purposes collateral or ancillary to or within the scope of the venture involves the familiar concept of there being within the mutual contemplation of the parties to a contract certain notional constraints on the way in which or the time within which a contract can be performed. In this context it is frequently necessary to identify the limits of 'the commercial purpose of the contract', as in the principles relating to frustration and E repudiatory breach.

**The limits of the scope of the venture**

The relationship between an underwriting name and Lloyd's is similar in principle albeit far from identical in detail to that between the members of the agricultural society in *Hole v Garnsey* (above) and the society itself. Both societies had been created under F statute; both had a rule-making power and both had a contractual relationship with the members. In both cases the members were by contract bound by such changes to the rules or byelaws as were made in accordance with the statutes and in accordance with the procedural requirements for passing such rules or byelaws. It follows that in both cases, when evaluating the validity of a new rule or byelaw, it is necessary to investigate whether its effect is to introduce so substantial a departure from the pre-existing venture as to G create a fundamentally different bargain from that which is taken to have been originally contemplated by the parties or whether that which is introduced is no more than a change ancillary or collateral to the venture as mutually perceived by the parties.

The objects of Lloyd's as set out in s. 10 of the *Lloyd's Act* 1871 as amended by s. 4 of the *Lloyd's Act* 1911 are:

> 'the carrying on by Members of the Society of the business of insurance of every H description including guarantee business;
>
> the advancement and protection of the interests of Members of the Society in connection with the business carried on by them as Members of the Society and in respect of shipping and cargoes and freight and other insurable property or insurable interests or otherwise;
>
> the collection publication and diffusion of intelligence and information;

the doing of all things incidental or conducive to the fulfilment of the objects of the Society.' A

By s. 6(1) of the *Lloyd's Act* 1982 the council is given:

> 'the management and superintendence of the affairs of the Society and the power to regulate and direct the business of insurance at Lloyd's and it may lawfully exercise all the powers of the Society . . .'

and by s. 6(2) the council is given power to: B

> 'make such byelaws as from time to time seem requisite or expedient for the proper and better execution of Lloyd's Acts 1871 to 1872 and for the furtherance of the objects of the Society . . .'

It is not submitted that the byelaws giving effect to the R & R, as well as the 3 September 1996 Resolution and Directions are inconsistent with the words of the legislation. The defendants' case is that the scope of the venture is substantially narrower than that expressed in s. 4 of the 1911 Act and that the Equitas Scheme is so fundamentally different from the way in which the business of insurance had hitherto been conducted at Lloyd's that it cannot be within that scope. C

There can be no doubt that the Equitas Scheme does involve considerable differences from anything which had previously been in operation at Lloyd's. The essential differences are the fact that: D

(1) Equitas is a run-off reinsurance applicable to all syndicates and not exclusively to the name's own syndicate;

(2) the premium for the reinsurance contract has been provided not only by the names whose liabilities have been reinsured but also by Lloyd's, the agents, some of the brokers and some of the accountants; E

(3) the administration of the run-off of the 1992 and prior years is conducted exclusively by Equitas and is not conducted by the individual names' managing agents.

However, the fact that differences from the previous regime may be considerable does not answer the question whether the exercise by Lloyd's of its regulatory powers goes beyond the purposes for which they are agreed upon, that is to say, beyond the scope of the venture. The correct approach to this question is, in my judgment, to ask whether, having regard to the way in which underwriting business had hitherto been conducted at Lloyd's and to the objects of Lloyd's set out in the 1911 Act and to the purposes of the regulatory powers set out in s. 6 of the 1982 Act and in Sch. 2 of that Act, it can be said that the council's purpose in the purported exercise of its powers has been to create a regime so different from that mutually contemplated as to create a fundamentally different venture. Only if that conclusion could be reached could it be said that the powers had been exercised for an impermissible purpose. This therefore is not simply a matter of comparing and contrasting the organisation of business at Lloyd's at the time when the name joined or became a member of a particular syndicate with that resulting from the exercise of Lloyd's legislative power. F G

It is clear from the review of the authorities including *Hole v Garnsey* on the exercise of powers of amendment conducted by Hobhouse LJ in the recent decision of the Court of Appeal in *Napier v R F Kershaw Ltd* [1996] CLC 1875 which was concerned with the power to vary the Lloyd's trust deed, that those cases (at p. 1894C), H

> 'demonstrate that such clauses have been held to permit radical variations which significantly affect the rights of other parties and the general purpose of such clauses as being to enable appropriate provision to be made for extreme situations

© 1997 CCH Editions Limited

A which had not been anticipated by those originally responsible for drafting their document.'

Having regard to the purposes for which Lloyd's set up the Equitas Scheme and taking fully into account the extent to which the run-off regime created by the scheme differed from the regime which had previously operated, it is in my judgment, quite impossible to conclude that such exercise of the legislative power was for an impermissible purpose. B The effect was not to change the scope of the venture so that what was created was a fundamentally different business. All that happened was that a means was devised for protecting the members of the market from the severe impact of market losses which were seen on comprehensive advice as likely to occur. Although one of the consequences of this scheme was to take away from individual managing agents the function of syndicate claims management in respect of the underwriting years covered by the scheme, that was necessary to achieve the process of universal administration without which the C scheme would not have worked. This difference, like the existence of a global premium, were essential features of the scheme. The business the subject of the scheme had already been written on behalf of each underwriting name as a several contracting party operating through a managing agent and had already been reinsured in the ordinary way through a managing agent to a run-off agent. The defendants' business had already been delegated by the managing agent to a run-off agent. Many of the losses attributable to that business had no doubt been long since paid. The Equitas Scheme was directed to the protection D of the names against the consequences of that business. That being so the scheme is the paradigm of the ancillary measure, designed to alleviate the wholly unexpected consequences of the previous participation by the defendants in the venture of underwriting insurance business at Lloyd's.

It cannot even be said that the names have by means of the scheme somehow ceased to be severally liable to their assureds. On the contrary, they remain severally liable on every E risk written on their behalf, a liability which could theoretically be enforced if Equitas were ever to go into liquidation before concluding the run-off. The argument of the defendants to which I have referred that the scheme is inconsistent with the several liability of the names is, in my judgment, misconceived. The reinsurance of the run-off by Equitas has simply been on market-wide, uniform terms which have involved the names transferring their assets and paying premium to a reinsurance company in F exchange for (i) cover and (ii) claims handling. The introduction of such a scheme in replacement of the conventional reinsurance to close cannot be anything other than for a purpose ancillary to the functions of loss protection and loss management. Those functions are an important part of the business of underwriting at Lloyd's, but the changes in those functions relied upon by the defendants resulting from the introduction of the scheme came nowhere near to changing the scope of the venture within the mutual contemplation of the parties in the sense referred to by Lord Atkin and Lord Tomlin in G *Hole v Garnsey* (above).

I would therefore hold that the argument based on the Equitas Scheme being outside the scope of the venture is unsustainable. It wrongly elevates the details of run-off reinsurance to fundamental and immutable features of the venture of underwriting at Lloyd's. As those are, in my view, no more than ancillary features of the business of underwriting, I conclude that byelaws which had no greater effect than changing *those* H features in the advancement and protection of the interests of members in connection with the business carried on by them had a purpose which was ancillary or collateral to the venture as distinct from a purpose which involved the substitution of a fundamentally different venture.

Before leaving this point I must refer to a number of points raised by the defendants and intervenors in support of their submission that the effect of the Equitas Scheme gave rise to a departure from the scope of the venture.

I turn first to the submission that the scheme involved a departure from the several conduct of the names' underwriting business and to introduce what has been called mutualisation. The point rests on those submissions which I have identified in para. 2(d)(vi) of the defendants' submissions and in particular upon the pooling of the names' assets for the benefit of a market-wide reinsurance to close. The report which Slaughter & May made to the Validation Steering Group to which I have already referred expressly considered mutualisation in this context and expressed the following view: A B

'. . . the proposed compulsory reinsurance into Equitas does not override the fundamental principle of several liability, any more than any other reinsurance by a syndicate of its whole account, such as reinsurance to close of the usual kind from one syndicate year into the next. It is true that under a reinsurance of this kind the premium is paid over to the reinsurer absolutely, and that the reinsurer in consequence may pay claims made on one Name on the reinsured syndicate out of premium paid by another. In a loose sense, this may resemble mutualisation of liabilities, but it is not true mutualisation. The reinsurance premium is not held by the reinsurers as a segregated mutual fund for the payment of mutual liabilities: it simply forms part of the general assets of the reinsurers. Nor is any individual Name required to pay a further premium in the event that his claims exceed the premium and its investment proceeds, as would be the case in a scheme of mutual insurance. Each individual remains, as he or she always was, severally liable to the extent of his subscription and no further. It cannot be said that one member becomes responsible for the liabilities of another because the liabilities of both are reinsured into the same entity and will therefore be discharged out of the funds paid to that entity by the members concerned.' C D

This advice was considered by Brooke LJ in the course of his judgment in the judicial review proceedings, *R v Council of the Society of Lloyd's, ex parte Johnson* (unreported, 16 August 1996) in which the question arose whether certain features of the R & R were ultra vires Lloyd's powers. It was held, not for the first time, that Lloyd's was not a body subject to judicial review, but in the course of his judgment Brooke LJ considered arguments some of which were similar to those advanced before me, among them the submission that R & R involved mutualisation. In his judgment, Brooke LJ accepted that, in view of the purpose for which the R & R and Equitas Scheme had been established, the introduction of an element of mutualisation represented by the use of the Central Fund to pay for part of the Equitas premium did not render the scheme an improper exercise of Lloyd's powers. He said this at pp. 89–91: E F

'It is very clear to me that during the last 18 months the Council of Lloyd's has had well in mind the statutory objects of Lloyd's and the fact that it has the power to levy Central Fund contributions (subject to the approval of the majority of those levied who attended the appropriate meeting) and to hold the Society's funds and to make byelaws for the furtherance of those objects. It has published its R & R plan and made the empowering byelaw (whose validity is not challenged) because it considers in good faith that the drastic measures it proposes are necessary for the advancement and protection of the interests of the members. G

It is clear that it believes that without the compulsory reinsurance of 1992 and prior years of account into Equitas, the Society has no reasonable hope of making the fresh start it so fervently seeks in order to avoid what it regards as the damaging process of run-off. H

For these reasons, even though individual features of the plan might in a different context amount to unacceptable mutualisation, I am quite satisfied that the Council of Lloyd's is acting within the powers given to it by the Acts and the

© 1997 CCH Editions Limited

A byelaws in promoting all the elements of the plan, and I accordingly reject the applicants' first ground of challenge.'

The element of mutualisation considered in that case appears to be a significantly greater departure from the concept of the several conduct of the names' business of underwriting than any of those features of the Equitas Scheme identified by the defendants or the intervenors in this case. Just as the use of the Central Fund for funding
B the Equitas Scheme was, within the context of R & R as a whole, a permissible exercise of Lloyd's powers, so in this case, even if, on analysis, and contrary to my own view, there are elements of mutualisation involved in the pooling of assets for the purpose of obtaining reinsurance, the elements of the scheme are all ancillary to the names' Lloyd's venture and come nowhere near the substitution of a fundamentally different venture outside the scope of that in which the defendants initially participated.

C Furthermore, the suggestion that the individual names have been placed in a position by the Equitas Scheme where they may be prejudiced because the Equitas premium was arrived at on an overall basis loses sight of the fact that the contribution which each name was obliged to make by way of premium was calculated by reference to the exposures of that name's syndicate, as Mr Sandler explained in his affidavit in the judicial review proceedings. Moreover, the individual name's assets and premiums trust funds will be used to settle that name's liabilities for they are the premium or part of it with
D which he purchases his own reinsurance.

Another submission which calls for particular comment is that based upon the use of the Substitute Agents Byelaws to replace the syndicate managing agents with AUA9. This again has to be seen in context. As Mr Sandler states in his affidavit, it would not have been administratively practicable or fair to all names to operate a scheme under which those who did not assent to R & R remained in run-off and did not come within
E the Equitas reinsurance contract. This is obvious. In no realistic sense would it have been practicable to conduct the Equitas Scheme when a minority of the syndicate members were still operating through independent run-off agents. Fragmentation of the reinsurance protections of a syndicate were administratively impossible and unprecedented. In view of the need to set up the scheme with speed following completion of the consultation process, the use of AUA9 as an instrument for imposing uniformity
F on the market was, in my view, a clearly justifiable operation of the Substitute Agents Byelaws. In as much as AUA9 was to be used exclusively for the purpose of effecting the Equitas Scheme, which was in itself a legitimate exercise of Lloyd's legislative powers within the scope of the underwriting venture, I fail to see how in this context the interposition of AUA9 can of itself be said to represent a departure from that venture.

The absence of monitoring of the appropriateness and adequacy of the RITC by independent syndicate auditors is also relied upon as a departure from the scope of the
G venture. This point is, in my view, quite hopeless. The overriding purpose of an independent syndicate solvency audit is to monitor the financial viability of the syndicate with regard to its loss reserves and reinsurance protections and the RITC. It is an essential element in satisfying the US regulatory bodies and the DTI that Lloyd's syndicates should be permitted to continue underwriting. The audit thus forms a key part of the market, underpinning the whole regulatory system. There has been substituted for this
H regime a market-wide investigatory system for the purpose of setting up Equitas and so that Lloyd's would be informed as to the level of premium which it could fairly charge to names and which would secure adequate run-off cover in respect of the years to be closed. That replacement of the conventional syndicate-by-syndicate audit has satisfied the regulatory authorities. The loss-reserving investigation has been most comprehensive and the premium has been arrived at on the basis of expert actuarial and accounting advice. The theoretical outstanding exposure of names in the event of the collapse of Equitas is

substantially that which would be experienced if the defendants' syndicate had reinsured its long tail run-off under previous underwriting years. If the assets of an outside reinsurer ultimately proved to be inadequate, the exposure of the reassured names would become unprotected and unpaid losses would have to be satisfied by names. The loss of the individual syndicate audit and its replacement by the Equitas Scheme for the purpose of enabling the Lloyd's market to continue to trade cannot be described as anything more than an ancillary expedient to solve an exceptional problem and to enable essentially the same venture to continue to operate. There is nothing impermissible in the use of the byelaws and directions to achieve this purpose in this way. A B

I therefore reach the conclusion that there is absolutely no realistic prospect of its being established, should this matter go to a full trial, that the Equitas Scheme was, on any of the grounds relied upon by the defendants or intervenors, an impermissible use of the legislative power of Lloyd's because it was outside the scope of the venture upon which the defendants entered when they contracted into the market. C

**Irrationality**

It is said that no market regulatory body such as Lloyd's acting reasonably would have imposed the Equitas Scheme on non-assenting names. This being an alternative way of attacking the R & R byelaws and the resolution of September 1996, it is necessary to assume that the entire scheme was within the scope of the venture, including its application to non-assenting names. D

I am bound to say at the outset that I have found the defendants' and intervenors' submissions on irrationality entirely unreal. In determining what Lloyd's acting reasonably might do, it is necessary to keep well in mind the words of s. 4 of the 1911 Act and s. 6 of the 1982 Act. The plaintiffs submit, and I accept, that in order to test this point it is necessary to ask whether the Council of Lloyd's formed the opinion which the words of the statute required them to form, namely that the R & R byelaws coupled with the September 1996 Resolution was 'requisite or expedient for the proper and better execution of Lloyd's Acts . . . and for the furtherance of the objects of the Society', such objects being those set out in section 4 of the 1911 Act including 'the advancement and protection of the interests of Members . . . in connection with the business carried on by them as Members'. On that point there is no issue. The second question is whether the council formed that belief in good faith. On that point also there is no issue. And so the key question is whether the council, acting rationally and taking into account all relevant considerations and excluding all irrelevant considerations, was entitled to arrived at the belief that the Equitas Scheme should be imposed on non-assenting names. Was that in all the circumstances and having regard to the words of s. 4 of the 1911 Act and s. 6 of the 1982 Act a rationally tenable view? E F

Now, although Mr Tager has not mounted an attack on the entire R & R as ultra vires for irrationality and has confined his attack to the imposition of the scheme on non-assenting members, the substance of his attack is such that if Lloyd's was acting irrationally in putting forward the Equitas part of R & R and then imposing that part on non-assenting names, the elements of irrationality relied upon go to the whole basis of R & R. G

I have already considered the reasons why the council concluded that compulsory imposition of the Equitas Scheme on non-assenting names was appropriate in the interests of overall fairness and administrative practicality. A further consideration was that, unless the R & R offer were put forward on the basis that the Equitas Scheme would be of universal application, many of the members who accepted it might have been induced to reject it in the hope that they might wholly escape outstanding liabilities, leaving it to Equitas to pay claims rateably in respect of the accepting members. This H

© 1997 CCH Editions Limited

A might well have endangered the whole R & R, for acceptances might have been too few to make the scheme sufficiently viable to present to the regulatory bodies here and in the US and too few to enable it to be assumed with confidence that the outstanding litigation would cease and therefore that R & R could be brought into operation.

The problem which confronted the council in 1996 involved in essence a choice between a market closure and run-off or continuation of the market on the basis of substantially
B the scheme offered to the names. As indicated by Mr Sandler in his second affidavit and his affidavit for the judicial review proceedings, the matter was of extreme urgency. If the market was to be saved, the decision had to be taken then and no later as to whether on the advice and information available to the council, including the intrinsic uncertainty of loss-reserving and consequent imprecision of premium calculation, including also the need to achieve uniformity across the entire market and so to bring in the Lioncover exposure and in effect, Lloyd's itself as a reassured, it was a permissible use of Lloyd's
C legislative powers to introduce the Equitas Scheme on a compulsory basis. In view of the immense amount of work that went into this scheme and of the content and extent of the advice that the council received, it is, in my judgment, impossible to conclude that the council could not rationally have believed that it was more consistent with the well-being of the entire membership to impose the Equitas Scheme in its final form and notwithstanding the imperfections highlighted by the defendants, rather than to have
D spent more time trying to arrive at greater precision or delivering to the names yet further detailed information beyond that in SOD, rather than leaving it to the names to make further enquiries from the information services provided by Lloyd's or rather than simply giving up on the whole idea of a market-wide run-off reinsurance and permitting the society to go into run-off.

I therefore do not consider that there is any substance in this point. There is no realistic prospect of the defendants succeeding on it if this matter went to trial, even after the
E defendants had called expert evidence to make good their criticisms of the scheme and the details of loss-reserving premium fixing and possible prejudice to certain of the individual names on which they rely.

I should add that the passage from De Smith, *Administrative Law*, already referred to, does not assist the defendants. It relates to *procedures* for arriving at administrative decisions and not to the quality or impact of the administrative decisions so made: see
F the passage at the start of the section at p. 375. The materiality of absence of reasons in relation to irrationality is evidential and not substantive: see the speech of Lord Keith in *R v Secretary of State for Trade and Industry, ex parte Lonrho plc* [1989] 1 WLR 525 at pp. 539–540:

> 'The absence of reasons for a decision where there is no duty to give them cannot of itself provide any support for the suggested irrationality of the decision. The
> G only significance of the absence of reasons is that if all other known facts and circumstances appear to point overwhelmingly in favour of a different decision, the decision-maker, who has given no reasons, cannot complain if the court draws the inference that he had no rational reasons for his decision.'

**The conflict of interest point**

H This in essence involves the propositions that:

(1) AUA9 is equivalent to or the creature of Lloyd's;

(2) it is in the interests of the council that all names should be reinsured into Equitas;

(3) there is a conflict between the interests of Lloyd's in procuring adherence to the Equitas Scheme and the interests of the individual names, such as the defendants to whom the managing agent or substitute owed a fiduciary duty;

(4) the non-assenting names never agreed to Lloyd's or AUA9 binding them to the reinsurance contract and therefore, in view of the conflict of interest, the reinsurance contract is not binding on the non-assenting names. A

For the purpose of testing this point it has to be assumed that all the features of the Equitas Scheme were within the scope of the venture and were not tainted by irrationality to the effect that they were the result of an entirely proper exercise of Lloyd's legislative powers. One is then left with the position that both the names by the terms of their general undertaking and managing agents and AUA9 as substitute by reason of the byelaws are under a duty to comply with the byelaws and resolutions of the council. Moreover, under the standard form of managing agent's agreement there is a mutual obligation to comply with the byelaws. That is the legislative regime into which the names have contracted. B

Against this background there cannot logically be any room for the intrusion of the well-known principles of conflict of interest on which Mr Tager relies. If it is in the interests of Lloyd's to procure universal adherence to the Equitas Scheme and if, for the purpose of achieving that end, it validly introduces a byelaw requiring a managing agent or a substitute agent to enter into some transaction – such as a reinsurance contract – on behalf of the names for whom he acts, there can be no question of the agent being required under some paramount rule of law, having disclosed his own interest or that of Lloyd's to ask for the consent of the name to his entering into the reinsurance contract. He has no choice in the matter. Nor does the name. Both are bound by the byelaws and resolutions of the council. This is not the case of an ordinary arms-length principal and agent relationship but of a formalised agency within the confines and constraints imposed by the legislative regime of the market into which both agent and name have contracted. C D

This point is therefore fundamentally misconceived and it is unnecessary for the purposes of this judgment to consider whether in the context of an agency relationship unaffected by the Lloyd's legislative regime there would indeed have been any conflict of interest. E

**The validity of the appointment of AUA9 as substitute agent**

This point has to be tested on the assumption that the imposition on non-assenting names of the Equitas Scheme was by means of a valid byelaw and resolution not ultra vires Lloyd's legislative powers. In order to justify the appointment of a substitute agent the council must establish any one of the events or matters set out in para. 1 of the SAB referred to earlier in this judgment. Amongst those events and matters at para. 1(b) is where in the opinion of the council 'it is essential for the proper regulation of the business of insurance at Lloyd's'. F

On the evidence before me, the council clearly formed such an opinion. AUA9 was according to Mr Sandler an essential means of imposing the Equitas Scheme on non-assenting names who had already attempted to withdraw the authority of their existing managing agents to enter into the reinsurance contract and who might in future attempt to do so. Having regard to the fact that the council had properly (as I have held) formed the belief that imposition of the scheme on non-assenting names was essential for the operation of R & R, I have no doubt that the council could properly form the opinion that the appointment of AUA9 was 'essential for the proper regulation of the business of insurance at Lloyd's'. There is nothing in the argument advanced by the defendants that this power of appointment can only be exercised separately for each syndicate and cannot be exercised on a global basis. There is nothing in the SAB or the 1982 Act which requires the words of para. 1(b) to be read in this way. Nor, in my view, is there any implied limitation upon the use of SAB which would confine the council's powers of appointment to circumstances where it was necessary to replace the existing agent in order to obtain G H

© 1997 CCH Editions Limited

A some management or administrative objective as distinct from some market-wide objective such as R & R. It is not suggested that the appointment of AUA9 was in itself invalid for irrationality.

In these circumstances, I have no doubt that Lloyd's validly appointed AUA9 as substitute agent. Since para. 1(b)(ii) of the SAB is an alternative ground for appointment to para. 1(b)(i), it is unnecessary to investigate whether the appointment was in the interests of the individual defendants. B

## Lloyd's title to sue

The argument of the defendants is that there was no legal assignment of the Equitas premium by AUA9 to Lloyd's and therefore Lloyd's is no more than an equitable assignee and cannot sue in its own name and must join Equitas as co-plaintiff. The C factual basis for this submission is that the letter of 1 October 1996 to the defendants would not be a valid notice of the assignment because, surprisingly, the assignment only took place on the following day. There was, however, a second notice of assignment given on 2 October by Equitas to AUA9. The defendants submit that such notice was also invalid because AUA9 was never validly appointed under the SAB and because there was no reason to believe that AUA9 would transmit the information to the defendants.

D I have already held that AUA9 was validly appointed. Consequently, it stood in the shoes of the managing agents or run-off agents for all purposes and, just as notice to such agent of assignment of premium by an external run-off reinsurer would be an effective notice to that agent's underwriting names, so the notice to the substitute agent, AUA9, was an effective notice of assignment to the defendants.

In the result, valid notice of assignment was given and Lloyd's therefore has title to sue E in is own name.

Had I concluded that AUA9 was not validly appointed it would have been necessary to decide whether a valid notice of assignment had been given to the defendants because they would not have been parties to the reinsurance contract with Equitas. Even if they were bound to that contract by some other means, the question would arise whether, in the absence of a valid notice of assignment, Lloyd's could sue in its own name without F joining Equitas.

The effect of the omission of an equitable assignee to join an equitable assignor as co-plaintiff was considered by Scott J in *Weddell v J A Pearce & Major* [1988] Ch 26. He held after a wide-ranging review of the authorities that such an action will not be struck out until the plaintiff has had an opportunity to join the assignor as a party, but that the action could in the discretion of the court be stayed until that was done. At p. 43B he G observed:

> 'Even this is not an invariable practice. In a case where the protection of the defendant debtor from claims by the legal owner of the chose in action can be seen to be unnecessary, the equitable assignee can prosecute the action to final judgment without joining the assignor as a party: see *Brandt's case* [1905] AC 454.'

Although, having regard to my conclusion on the validity of the notice of assignment H of 2 October 1996, it is unnecessary to decide whether the failure to join Equitas is a good defence to a claim as equitable assignee, I am bound to say that, had such a decision been necessary, I would have taken exactly the same view as Scott J. and would have decided that since, on the available evidence, there was not even the remotest prospect of the defendants being exposed to the risk of claims for premium by Equitas if they satisfied the claim by Lloyd's, it would not have been appropriate to stay these proceedings pending joinder of Equitas.

**Conclusion**

I therefore hold that the defendants have failed to establish that any of the grounds which have been argued before me represent arguable defences or, if these actions were permitted to go to trial, would have any realistic prospect of success. It follows that there will be judgment in declaratory form under O. 14A in the plaintiffs' favour on each of the defences. The validity of the other defences to be relied on by the defendants and perhaps the intervenors will have to be considered at a subsequent hearing.

(*Order accordingly*)

---

© 1997 CCH Editions Limited