UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE SOCIETY OF LLOYD'S, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 06-106-T |
| BRUCE G. SUNDLUN, | : | |
| Defendant. | : | |

**DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Bruce Sundlun ("Sundlun") hereby objects to the Motion for Summary Judgment of Plaintiff, the Society of Lloyd's. In support of his objection, Sundlun submits the accompanying Memorandum of Law, Affidavit, and Statement of Disputed Facts and Alleged Undisputed Facts that Defendant Denies or Controverts.

BRUCE SUNDLUN
By his Attorneys,

/s/ Robert G. Flanders, Jr.
Robert G. Flanders, Jr. (#1785)
Anna M. Piazza (#7206)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
rflanders@haslaw.com
apiazza@haslaw.com

DATED: November 30, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2006, a copy of the foregoing Objection to Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Robert G. Flanders, Jr.
Robert G. Flanders, Jr. (#1785)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
rflanders@haslaw.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE SOCIETY OF LLOYD'S, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 06-106-T |
| BRUCE G. SUNDLUN, | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The defendant, Bruce Sundlun ("Sundlun"), submits this memorandum of law in opposition to the motion for summary judgment that the plaintiff, The Society of Lloyd's ("Lloyd's"), has filed. The Court should deny Lloyd's motion because genuine issues of material fact exist that preclude summary judgment. In any event, Lloyd's is not entitled to judgment as a matter of law because it failed to properly serve process on Sundlun in connection with the 1997 default judgment that it obtained against him in England. Consequently, because Sundlun received inadequate notice of the lawsuit against him, and because Sundlun did not otherwise agree to submit to its jurisdiction, the English Court lacked personal jurisdiction over Sundlun and Lloyd's motion should be denied.

## I. DISPUTED FACTS

### A. Sundlun's Status as a Former Member of Lloyd's is Disputed

At some point prior to 1987, Sundlun's friend, Morton Smith, a Rhode Island insurance agent, suggested that Sundlun become a member of Lloyd's. (Sundlun Affidavit, ¶2) At the time, Sundlun understood that his proposed membership in Lloyd's would be an honorary

position and that he would face no risk or liability in his capacity as a Lloyd's member. (Id., ¶3) Although Lloyd's contends that Sundlun actually became a member of Lloyd's (Lloyd's Statement of Undisputed Facts, ¶1), Sundlun personally took no steps to become such a member. (Sundlun Affidavit, ¶4) And even though Lloyd's posits that Sundlun signed a 1987 General Undertaking Agreement, Sundlun maintains that he signed no such General Undertaking Agreement, nor even any membership application. (Id., ¶5) Likewise, Sundlun authorized no one else to sign such papers on his behalf. (Id.) Contrary to the usual prerequisites for becoming a member of Lloyd's, Sundlun did not submit to any financial means test and was never asked to, nor did he ever, post any security in connection with any membership with Lloyd's. (Id., ¶ 7) He also did not personally appear in London before a representative of the Council of Lloyd's, and he was never informed about, nor did he acknowledge, the risks and requirements of membership, including the fact that membership would subject him to unlimited personal liability. (Id.)

In any event, as Lloyd's admits (Lloyd's Complaint, ¶7, attached as Exhibit 1), on or before January 1, 1993, Sundlun terminated any alleged previous affiliation between himself and Lloyd's. Nevertheless, Lloyd's is still attempting to enforce a 1997 default judgment that it obtained against Sundlun in England based on certain unauthorized actions that Lloyd's took after the parties' relationship already had ended in 1993, including designating an agent to enter into contracts and to accept service of process on Sundlun's behalf. (Lloyd's Statement of Undisputed Facts, ¶¶11, 13) Because Lloyd's never properly served Sundlun with legal process in time for him to contest the English lawsuit, the default judgment was improperly obtained and should not be enforced by this Court.

**B. <u>The Reconstruction and Renewal Byelaw of 1995 and the 1996 Resolution and Directions of the Council of Lloyd's</u>**

Over two years after Sundlun ended whatever affiliation he may have had with Lloyd's, Lloyd's caused a so-called Reconstruction and Renewal Byelaw of 1995 to be enacted. This byelaw provided, in pertinent part, that:

> the Council [of Lloyds] … may direct any underwriting agent for the time being acting as such on behalf of a former member of the Society who remains subject to liabilities to which the Equitas scheme relates to enter on behalf of such former member into reinsurance contracts with Equitas with respect to such liabilities, for such premium to be paid or other consideration to be provided to Equitas and generally on such terms as shall be specified or referred to in an offer made by Equitas to that underwriting agent on behalf of the former member concerned under the Equitas scheme….

(1995 Byelaw, Part C, § 4(1)(c), attached as <u>Exhibit 2</u>) Additionally, the Council of Lloyd's issued Resolution and Directions in 1996, which vested the Substitute Agent with the power "to execute the Reinsurance Contract for itself and on behalf of the Members … and to undertake all obligations of the Substitute Agent under the Reinsurance Contract … and to perform all functions necessary therefor or incidental thereto." (1996 Resolution and Directions, § 1(iv), p.7, attached as Exhibit 3 to Declaration of Nicholas Demery) Sundlun never agreed, however, that, even after he no longer had any relationship with Lloyd's, Lloyd's could still enact "byelaws" and resolutions that would bind him to reinsurance agreements or to the appointment of an agent to accept service of process on his behalf (much less to enter into various other unknown and unauthorized agreements on his behalf) – all without his knowledge or consent.

**C. <u>The Reinsurance and Run-Off Contract</u>**

On September 9, 1996, more than three years after Sundlun and Lloyd's terminated whatever relationship previously existed between them, an entity known as Equitas Reinsurance

Limited ("Equitas") and an entity that Lloyd's unilaterally designated to serve as Sundlun's agent, Additional Underwriting Agencies (No. 9) Limited ("AUA9"), entered into a so-called Reinsurance and Run-Off Contract ("the Reinsurance Contract"). This contract provided that "[e]ach Name and Closed Year Name not domiciled in the United Kingdom hereby irrevocably appoints the Substitute Agent [AUA9] as agent to accept service of any proceedings in the English courts on his behalf." (Reinsurance and Run-Off Contract, § 25.2, attached as Exhibit 3) Sundlun was not a party to this contract and never agreed to allow AUA9 or any other entity to be appointed as his agent to accept service of process on his behalf for any proceedings in English Courts. Most importantly, he never agreed to allow Lloyd's to enact any byelaw, after his relationship with Lloyd's had ended, that would bind him in any way.

This Reinsurance Contract further provided:

> each party hereto irrevocably agrees to submit to the jurisdiction of the High Court of England and Wales and irrevocably waives (a) any objection which it or he may have now or hereafter to any such suit, action or proceeding being brought in such court and (b) any claim that any such suit, action or proceeding has been brought in an inconvenient forum, and further irrevocably agrees that a judgment in any suit, action or proceeding brought in the High Court of England and Wales shall be conclusive and binding upon such party and may be enforced in the courts of any other jurisdiction.

(Id. at § 25.1). After ending his relationship with Lloyd's in 1993, Sundlun never agreed to submit disputes with Lloyd's, with Equitas, or with AUA9 to any English Courts, much less did he agree that Lloyd's could enact any byelaw that would retroactively bind him. Nor did he agree that Lloyd's, Equitas, or any other entity could appoint an agent on his behalf to accept service of process for him, to enter into contracts on his behalf, or to act for him for any other purpose. Nevertheless, these are the factual circumstances that Lloyd's is relying upon to enforce the default judgment against Sundlun.

### D. <u>The English Lawsuit</u>

On February 21, 1997 – over four years after Sundlun and Lloyd's ended whatever relationship they may have previously had with one another – Lloyd's filed suit against Sundlun in England. Sundlun, however, was not aware at that time that it had done so. (Sundlun Affidavit, ¶9) On June 24, 1997, an English Court entered the default judgment against him that is the basis for this action and Lloyd's pending summary judgment motion. At no time on or before June 24, 1997, however, was Sundlun served with a copy of the lawsuit or with any legal papers relating thereto (e.g., a Writ of Summons or an Acknowledgement of Service and Guidance Notes). (<u>Id.</u>) Nor did Sundlun otherwise receive notice of the Lloyd's lawsuit in time for him to have an opportunity to defend himself. (<u>Id.</u>) Some time on or shortly before June 24, 1997, the same day (unbeknownst to Sundlun) that the default judgment entered, he received a letter from an entity calling itself AUA9 relating to the Lloyd's lawsuit. (<u>Id.</u>, ¶10) Unbeknownst to Sundlun, AUA9 was an English firm that purported to be the agent that Lloyd's supposedly designated several years after his relationship with Lloyd's had ended in 1993 to accept service of process on Sundlun's behalf. Sundlun responded by promptly informing AUA9 of his previous resignation from Lloyd's and by explaining that he did not understand how he faced any liability. (<u>Id.</u>) Contrary to Lloyd's allegations, the letter from AUA9 failed to enclose any Writ of Summons or form for Acknowledgement of Service, nor did Sundlun receive or acknowledge receipt of such documents from AUA9 or from anyone else. (<u>Id.</u>) On July 25, 1997, Sundlun wrote to AUA9, informed AUA9 that he had not received a copy of the Writ of Summons, asked for further details underlying the basis of Lloyd's lawsuit against him, and requested the name of Lloyd's counsel. (<u>Id.</u>, ¶11) He received a reply to this letter on August 28, 1997. (<u>Id.</u>, ¶12) In the letter, AUA9 finally identified Dibb Lupton Alsop as counsel for

Lloyd's. It still failed, however, to provide a copy of the Writ of Summons. (Id.) With no copy of the Writ of Summons or timely notice of the claims against him before the default judgment entered, Sundlun had no meaningful opportunity to defend himself against Lloyd's claims. (Id., ¶13)

## II. THE LEGAL REQUIREMENTS FOR GRANTING SUMMARY JUDGMENT

A court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, a court must view "the entire record in the light most flattering to the nonmovant and indulge[] all reasonable inferences in that party's favor." Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997). "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." Id.

A party seeking summary judgment must establish the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986). An issue of material fact is "genuine" when "the evidence relevant to the issue … [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A disputed fact is "material" when it has the capacity to sway the outcome of the litigation either way. Id.

## III. ARGUMENT

Courts refuse to recognize foreign judgments when the rendering court lacked personal jurisdiction over the defendant. "A court in the United States may not recognize a judgment of the court of a foreign state if … the court that rendered the judgment did not have jurisdiction over the defendant in accordance with the law of the rendering state" or with international concepts of jurisdiction. Restatement (Third) of Foreign Relations Law § 482(1)(b), cmt. c.

Additionally, a United States court will not recognize a foreign judgment when the plaintiff failed to serve the defendant with process or provide him with reasonable notice of the lawsuit in sufficient time to enable him to defend himself. Thus, a United States court "need not recognize a judgment of the court of a foreign state if … the defendant did not receive notice of the proceedings in sufficient time to enable him to defend." Id. at § 482(2)(b). Underlying this rule is the policy that "[t]he right to be heard before one's interests are adjudicated is a fundamental principle of fairness." Restatement (Second) of Judgments § 2 at cmt. A. Notice is adequate only if:

> (a) The notice is official in tenor, and states that the action is pending or about to be commenced and that there is opportunity to be heard concerning it and affords a reasonable time in which that opportunity may be exercised; and
> (b) The notice is transmitted in a manner that actually notifies the person being addressed or someone who can adequately represent him, or has a reasonable certainty of resulting in such notice; and
> (c) The form of the notice and the method employed for transmitting it sufficiently comply with the procedure prescribed for giving notice.

Id. at § 2(1)(a)-(c) (emphases added). "[N]otice ordinarily consists of [a] summons with a copy of the complaint, which together warn of the action, and describe where it is pending and what it is about, and state that a default may be entered if no appearance is made." Id. at § 2 at cmt. b.

Furthermore, notice is inadequate when it does not "indicate the kind and magnitude of the relief sought." Id.

These principles requiring actual and timely notice of the lawsuit from a court having personal jurisdiction over the defendant take on added significance in the context of a foreign default judgment. "[S]ince a judgment rendered by a court not having jurisdiction over the judgment debtor is not entitled to recognition …, a court in the recognizing state will scrutinize the jurisdiction of the rendering court when that issue has not been adjudicated or waived in the rendering forum." Restatement (Third) of Foreign Relations Law § 481 at cmt. i. Indeed, in cases such as this one, where a foreign default judgment has entered against the defendant, courts apply the notice requirements strictly. See e.g., Zander v. Martine, 169 A.2d 228, 232 (N.J. Super. 1961) (setting aside default judgment where the plaintiff failed to strictly adhere to statutory service provisions); Sours v. State Director of Highways, 175 N.E.2d 77, 79 (Ohio 1961) (strictly construing substitute service provision to uphold lower court's vacatur of default judgment).

**A. The English Court Lacked Personal Jurisdiction over Sundlun**

Lloyd's relies upon the General Undertaking Agreement as the basis for the English Court's exercise of personal jurisdiction over Sundlun. See Mem. In Supp. of Pl.'s Mot. for Summ. J., at 10. That Agreement states, in relevant part:

> Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding … arising out of or relating to such matters shall be brought in such courts and, to this end, each party hereto agrees to submit to the jurisdiction of the courts of England and irrevocably waives any objection which it may have now or hereafter to (a) any Proceedings being brought in any such court as is referred to in this

> Clause 2 and (b) any claim that any such Proceedings have been brought in an inconvenient forum and further irrevocably agrees that a judgment in any Proceedings brought in the English courts shall be conclusive and binding upon each party and may be enforced in the courts of any other jurisdiction.

(General Undertaking Agreement at § 2.2, attached as Exhibit 1 to Declaration of Nicholas Demery (emphasis added)). According to Sundlun, however, the signature on the General Undertaking Agreement is not his, and Sundlun did not authorize anyone else to sign his name to that document. (Sundlun Affidavit, ¶5) Indeed, Sundlun says that he never saw this Agreement until after Lloyd's sought to recover on the English default judgment here in Rhode Island (Id.)[1]

Thus, a genuine issue of material fact exists concerning whether Sundlun ever was a member of Lloyd's. It is well-settled that a court will not grant summary judgment where the non-moving party disputes the authenticity of his or her signature on the document from which liability stems. See e.g., Namas Noor Sdn Bhd v. Williams, 112 F.Supp.2d 580, 584-85 (M.D. La. 2000) (denying the plaintiff's motion for summary judgment and concluding that an issue of material fact existed where defendants supplied affidavits stating that defendant did not sign acknowledgment of debt); First Lake Corp. v. Cunningham, No. 94-00729, 1996 WL 104362, at *3 (Mass. Super. Feb. 1996) (denying the plaintiff's motion for summary judgment where the defendant alleged that the signatures on a mortgage and pledge agreement were not hers and holding that there was "a genuine question of the validity of her signature, [a] material fact, that prevents summary judgment under said guarantee"); Cottingham v. Citizens Bank, 859 So. 2d 414, 420 (Ala. 2003) (holding that "the authenticity of the signature contained on the guaranty is

[1] In fact, Sundlun never fulfilled nor was asked to fulfill any of the requirements attendant to membership with Lloyd's. (Sundlun Affidavit, ¶7) See Haynsworth v. The Corporation, 121 F.3d 956, 959 (5th Cir. 1997) (stating that "[n]ames must pass a means test to ensure their ability to meet their underwriting obligations, post security (typically, a letter of credit), and personally appear in London before a representative of the Council of Lloyd's to acknowledge their awareness of the various risks and requirements of membership, and in particular the fact that underwriting in the Lloyd's market subjects them to unlimited personal liability").

an issue of material fact"); Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd., 117 F.Supp.2d 394, 402 (S.D.N.Y. 2000) (holding that dispute as to validity of signature on guaranty raised an issue of material fact, precluding court from resolving liability as to the guarantee on summary judgment). Hence, this Court should deny Lloyd's motion for summary judgment because an issue of material fact exists concerning the authenticity of Sundlun's signature.

In any event, even if Sundlun had signed the 1987 agreement with Lloyd's, it is undisputed that whatever relationship he had with Lloyd's had ended by January 1, 1993. (Lloyd's Complaint, ¶7, attached as Exhibit 1) Significantly, nothing in that agreement authorized Lloyd's to appoint one or more agents to enter into contracts or to accept service of process on Sundlun's behalf after the relationship between them had ended in early 1993, and nothing in that 1987 agreement authorized Lloyd's to enact byelaws that would bind Sundlun after the relationship had ended. Thus, Lloyd's reliance on having served AUA9 – an entity that Lloyd's or Equitas purportedly appointed as Sundlun's agent – after Lloyd's agreement with Sundlun had ended and without obtaining Sundlun's agreement or authorization for same – is wholly unjustified and illegal and cannot possibly serve as the basis for serving Sundlun with legal process, let alone holding him liable on the merits. Additionally, as explained below, service of process on AUA9 did not provide the English Court with jurisdiction over Sundlun because such service provided inadequate notice of the lawsuit to Sundlun. See, infra, at 12.

## B. Sundlun Received Insufficient Service of Process and Inadequate Notice of the Lawsuit Against Him

### 1. Service upon AUA9 constituted insufficient service of process upon Sundlun

The Court should also deny Lloyd's motion for summary judgment because Lloyds did not properly serve legal process on Sundlun. Lloyd's contends that the General Undertaking

Agreement, the 1995 Reconstruction and Renewal Byelaw, the 1996 Resolution and Directions of the Council of Lloyd's, and the Reinsurance and Run-Off Contract provided Lloyd's with the authority to appoint an agent for service of process on Sundlun's behalf. The General Undertaking Agreement, however, states, in pertinent part:

> Throughout the period of his membership of Lloyd's the Member shall comply with the provisions of the Lloyd's Acts 1871-1982, any subordinate legislation made or to be made thereunder and any direction given or provision or requirement made or imposed by the Council or any person(s) or body acting on its behalf pursuant to such legislative authority and shall become a party to, and perform and observe all the terms and provisions of, any agreements or other instruments as may be prescribed and notified to the Member of his underwriting agent by or under the authority of the Council.

(General Undertaking Agreement at § 1 (emphasis added)). The 1995 Byelaw and the 1996 Resolution purport to allow AUA9 to enter into the Reinsurance and Run-Off Contract on the behalf of names such as Sundlun. See supra at 3. The Reinsurance and Run-Off Contract, in turn, appointed an agent [AUA9] to accept service on behalf of the names. It is undisputed that none of this occurred during "the period of [Sundlun's alleged] membership of Lloyd's." See supra at 4.

Because Sundlun never signed the General Undertaking Agreement, he did not agree that he would comply with such enactments during the period of his relationship with Lloyd's, much less with a 1995 Byelaw and 1996 Resolution that were enacted after his affiliation with Lloyd's had ended in 1993.[2] Because Sundlun never agreed to the authorization provided for in the 1995 Byelaw and the 1996 Resolution, AUA9 could not enter into the Reinsurance and Run-Off Contract on Sundlun's behalf. And because the Reinsurance and Run-Off Contract did not bind

---

[2] Even if Sundlun had signed the General Undertaking Agreement, the 1995 Byelaw and the 1996 Resolution still would not bind Sundlun. According to the General Undertaking Agreement's plain language, the member must comply with legislation only "[t]hroughout the period of his membership." Sundlun resigned in 1993. Thus, the 1995 Byelaw and the 1996 Resolution were not enacted during "the period of his membership."

Sundlun, Lloyd's purported service of process upon AUA9 was insufficient to serve Sundlun in a manner sufficient to satisfy due process under applicable United States law.

**2. Service by other means did not afford Sundlun reasonable time and adequate notice to defend himself**

Although Sundlun received a letter from AUA9 concerning the pending English lawsuit, he did so only at or about the same time that the judgment in England entered against him. (Sundlun Affidavit, ¶10) Neither Lloyd's nor AUA9 gave Sundlun notice of the lawsuit in reasonable time for him to defend himself. Such inadequate and late notice violated basic principles of due process.

Moreover, Sundlun failed to receive adequate notice of the lawsuit because he did not receive a copy of the legal documents setting forth Lloyd's claim prior to the entry of the default judgment against him. (Id., ¶9-10) Thus, the notice he received was not only late and incomplete, it was not "official in tenor." Further, neither Lloyd's nor AUA9 otherwise informed Sundlun about the nature of the English action or the kind and magnitude of the relief that Lloyd's sought against him. (Id., ¶11-12) In the context of a foreign default judgment, this Court must strictly apply the rules governing service of process. Because service of process here was inadequate as a matter of law, this Court should so rule and deny the motion for summary judgment.

**3. Because, as a matter of law, service of process on Sundlun was inadequate to satisfy due process, this Court should grant summary judgment in favor of Sundlun on this basis**

A court may grant summary judgment to a non-moving party when no genuine issue of material fact exists about the legal question at issue. Wright et al, Federal Practice and Procedure: Civil 3d, § 2720. See also National Expositions, Inc. v. Crowley Maritime Corp., 824

F.2d 131, 133 (1st Cir. 1987) (stating that "a district court has the legal power to render summary judgment in favor of the party opposing a summary judgment motion even though he has made no formal cross-motion under rule 56").

Even were we to assume, arguendo, that Sundlun had validly executed the General Undertaking Agreement, service of process here was inadequate, as a matter of law, to comply with due process. According to the General Undertaking Agreement's plain language, the member must comply with legislation only "[t]hroughout the period of his membership." Thus, the General Undertaking Agreement itself limited compliance with legislation relating to Lloyd's to the period of Sundlun's purported membership.[3] Lloyd's concedes that Sundlun's membership ended as of January 1, 1993. Lloyd's is attempting, however, to rely upon the 1995 Byelaw and the 1996 Resolution as providing the means for proper service of process on Sundlun via service on AUA9, the purported agent that Lloyd's designated to accept service of process for Sundlun. But this legislation was not enacted and AUA9's designation as Sundlun's agent did not occur during the alleged "period of his membership" and, thus, it cannot possibly bind Sundlun. The Court, therefore, should conclude, as a matter of law, that Lloyd's service of

---

[3] Section 2.3 of the General Undertaking Agreement confirms that a member agrees to comply with bylaws only during the period of his or her membership. That section explicitly provides that the choice of law and jurisdiction provisions of the Agreement survive the termination of membership. (See General Undertaking Agreement at § 2.3 (stating that "[t]he choice of law and jurisdiction referred to in this Clause 2 shall continue in full force and effect in respect of any dispute and/or controversy of whatsoever nature arising out of or relating to any of the matters referred to in this Undertaking notwithstanding that the Member ceases, for any reason, to be a Member of, or to underwrite insurance business at, Lloyds")). This clause demonstrates that Lloyd's knew how to include language that would cause provisions of the contract to remain effective even after a name's membership had ended. But it failed to include such language with respect to compliance with the contractual provisions relating to byelaws or to the appointment of agents for members.

The Court should also note that the Substitute Agents Byelaw of 1983, which allegedly allowed the Council to appoint a specified person to act as an agent or sub-agent, was limited to "any underwriting member of the Society as to the whole or any part of that member's underwriting business." (Substitute Agents Byelaw at § 1, p.1, attached as Exhibit 2 to Declaration of Nicholas Demery) By its terms, however, this byelaw does not apply to former underwriting members who had ceased to engage in any underwriting business as a member of Lloyd's when the appointment was purportedly made.

process on AUA9 was inadequate service upon Sundlun. On this basis alone, the Court should grant summary judgment in favor of Sundlun.

## IV. CONCLUSION

For the above reasons, the Court should deny Lloyd's motion for summary judgment and grant summary judgment in favor of Sundlun.

BRUCE SUNDLUN
By his Attorneys,

/s/ Robert G. Flanders, Jr.

Robert G. Flanders, Jr. (#1785)
Anna M. Piazza (#7206)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
rflanders@haslaw.com
apiazza@haslaw.com

## ORAL ARGUMENT REQUESTED

Pursuant to LR Cv. 7(e), the defendant hereby requests oral argument on the motion for summary judgment and respectfully requests fifteen minutes to do so.

BRUCE SUNDLUN
By His Attorneys,

/s/ Robert G. Flanders, Jr.

Robert G. Flanders, Jr. (#1785)
Anna M. Piazza (#7206)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
rflanders@haslaw.com
apiazza@haslaw.com

Dated: November 30, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2006, a copy of the foregoing Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Robert G. Flanders, Jr.
Robert G. Flanders, Jr. (#1785 )
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
rflanders@haslaw.com

761739v8