UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THE SOCIETY OF LLOYD'S, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 06-106-T |
| BRUCE G. SUNDLUN, | : | |
| Defendant. | : | |

**DEFENDANT'S PRE-TRIAL MEMORANDUM**

The defendant, Bruce G. Sundlun ("Sundlun"), hereby submits his Pre-Trial Memorandum in accordance with Judge Lagueux's March 1, 2007 Pre-Trial Order.

**Sundlun's Legal Position In A Nutshell**

The English default judgment in question should not be enforced against Sundlun because the plaintiff, The Society of Lloyd's ("Lloyd's"), failed to serve him with legal process before obtaining that judgment. Therefore, the English court lacked personal jurisdiction over Sundlun to enter such a judgment against him. Instead of causing Sundlun to be personally served with legal process, Lloyd's served process on an entity in England that it unilaterally designated as Sundlun's "agent" three years after Sundlun resigned (effective January 1, 1993) as a member of Lloyd's. But Sundlun never even knew about such a designation, much less did he even agree to it. In 1996, unbeknownst to Sundlun, Lloyd's purported to serve this entity with legal process on the claim that led to the judgment in question. But Sundlun failed to learn or even know about the lawsuit until it was too late for him to defend himself against these claims. For this reason alone, the complaint should be dismissed and the judgment declared unenforceable against Sundlun.

**What Sundlun Expects To Prove In His Defense**

1. Sundlun resigned from Lloyd's in 1992 prior to the designation of an agent to accept service of process on Sundlun's behalf and prior to execution of the reinsurance contract between Additional Underwriting Agencies (No. 9) Limited ("AUA9") and Equitas Reinsurance Limited ("Equitas").
2. Sundlun's membership with Lloyd's terminated when he resigned, effective as of January 1, 1993.
3. Sundlun is not bound by byelaws that Lloyd's enacted, and contracts that Lloyd's designated agent purportedly entered into on his behalf, after he terminated his membership with Lloyd's in 1993.
4. Even if Sundlun's membership continued after he resigned in 1993, it did so only for the purpose of winding up his liabilities and not for the purpose of appointing agents to enter into new contracts or to accept service of process on his behalf.
5. Service upon AUA9 constituted ineffective service of process on Sundlun.
6. Sundlun received inadequate and untimely notice of the English lawsuit against him.
7. Because Lloyd's did not serve legal process on Sundlun before it entered the judgment in question, the English court lacked personal jurisdiction over Sundlun.

**Memorandum of Supporting Law**

## I. FACTS

Despite failing to serve Sundlun with legal process, Lloyd's is attempting to enforce a 1997 default judgment that it obtained against Sundlun in England for an unpaid insurance contract premium that Sundlun never agreed to pay. After Sundlun had resigned as a member of Lloyd's in 1993, Lloyd's purported to designate an entity to act as Sundlun's agent in entering

into a reinsurance contract on his behalf and purportedly empowered this agent to accept service of process for Sundlun. But Sundlun never agreed to allow Lloyd's to do so. Lloyd's also relies on an untimely and inadequate personal service of process on Sundlun. But Sundlun never received such service of process in time to contest the default judgment that was improperly obtained against him. For these reasons, the Court should not enforce this judgment.

**A. The General Undertaking Agreement**

On or about January 1, 1987, Sundlun allegedly executed a General Undertaking Agreement to serve as a name, or individual underwriter, for Lloyd's. The General Undertaking Agreement states, in pertinent part:

> Throughout the period of his membership of Lloyd's the Member shall comply with the provisions of Lloyd's Acts 1871-1982, any subordinate legislation made or to be made thereunder and any direction given or provision or requirement made or imposed by the Council or any person(s) or body acting on its behalf pursuant to such legislative authority and shall become a party to, and perform and observe all the terms and provisions of, any agreements or other instruments as may be prescribed and notified to the Member or his underwriting agent by or under the authority of the Council.

(General Undertaking Agreement § 1) (Emphasis added.) During the period of his membership with Lloyd's, therefore, the General Undertaking Agreement purports to bind Sundlun to legislation and directions and requires Sundlun to become a party to, perform, and observe contracts "as may be prescribed and notified to" him or his agent. As Lloyd's admits, however, on or before January 1, 1993, Sundlun resigned from membership with Lloyd's.

**B. The Reconstruction and Renewal Byelaw of 1995 and the 1996 Resolution and Directions of the Council of Lloyd's**

Over two years after Sundlun ended his membership with Lloyd's, Lloyd's caused a so-called Reconstruction and Renewal Byelaw of 1995 to be enacted. This byelaw provided, in pertinent part, that:

> the Council [of Lloyds] … may direct any underwriting agent for the time being acting as such on behalf of a former member of the Society who remains subject to liabilities to which the Equitas scheme relates to enter on behalf of such former member into reinsurance contracts with Equitas with respect to such liabilities, for such premium to be paid or other consideration to be provided to Equitas and generally on such terms as shall be specified or referred to in an offer made by Equitas to that underwriting agent on behalf of the former member concerned under the Equitas scheme….

(1995 Byelaw, Part C, § 4(1)(c)) Additionally, the Council of Lloyd's issued Resolution and Directions in 1996, which vested the Substitute Agent with the power "to execute the Reinsurance Contract for itself and on behalf of the Members … and to undertake all obligations of the Substitute Agent under the Reinsurance Contract … and to perform all functions necessary therefor or incidental thereto." (1996 Resolution and Directions, § 1(iv), p.7) Sundlun never agreed, however, that, even after his membership with Lloyd's had ended, Lloyd's could still enact "byelaws," directions, and resolutions that would bind him to reinsurance agreements that some newly minted, Lloyd's-designated "agent" entered into without his knowledge or consent. Notably, the General Undertaking Agreement makes no mention of the enactment of legislation to bind "former members."

**C. The Reinsurance and Run-Off Contract**

On September 9, 1996, more than three years after Sundlun terminated his membership with Lloyd's, an entity known as Equitas and an entity that Lloyd's unilaterally designated to

serve as Sundlun's agent, AUA9, entered into a so-called Reinsurance and Run-Off Contract ("the Reinsurance Contract"). This contract provided that "[e]ach Name and Closed Year Name not domiciled in the United Kingdom hereby irrevocably appoints the Substitute Agent [AUA9] as agent to accept service of any proceedings in the English courts on his behalf." (Reinsurance and Run-Off Contract, § 25.2) Sundlun was not a party to this contract and never agreed to allow AUA9 or any other entity to be appointed as his agent to accept service of process on his behalf for any proceedings in English courts. This Reinsurance Contract further provided:

> each party hereto [Sundlun was not a party] irrevocably agrees to submit to the jurisdiction of the High Court of England and Wales and irrevocably waives (a) any objection which it or he may have now or hereafter to any such suit, action or proceeding being brought in such court and (b) any claim that any such suit, action or proceeding has been brought in an inconvenient forum, and further irrevocably agrees that a judgment in any suit, action or proceeding brought in the High Court of England and Wales shall be conclusive and binding upon such party and may be enforced in the courts of any other jurisdiction.

(Id. at § 25.1) After ending his membership with Lloyd's in 1993, Sundlun never agreed to submit disputes with Lloyd's, with Equitas, or with AUA9 to any English courts, much less did he agree that any judgment in such courts would be conclusive or binding and could be enforced in the courts of any other jurisdiction. The General Undertaking Agreement bound Sundlun only to become a party to perform and observe insurance contracts during his membership with Lloyd's – not to post-termination reinsurance agreements entered into by some Lloyd's-designated agent without his knowledge or consent.

### D. The English Lawsuit

On February 21, 1997 – over four years after Sundlun ended his membership with Lloyd's – Lloyd's filed suit against Sundlun in England. Sundlun, however, was not aware at that time that it had done so. On June 24, 1997, an English court entered the default judgment

against him that is the basis for this action. At no time on or before June 24, 1997, however, was Sundlun served with a copy of the lawsuit or with any legal papers relating thereto (e.g., a Writ of Summons or an Acknowledgement of Service and Guidance Notes). Nor did Sundlun otherwise receive notice of the Lloyd's lawsuit in time for him to have an opportunity to defend himself. Some time on or shortly before June 24, 1997, the same day (unbeknownst to Sundlun) that the default judgment entered, he received a letter from an entity calling itself AUA9 relating to the Lloyd's lawsuit. Unbeknownst to Sundlun, AUA9 was an English firm that purported to be the agent that Lloyd's supposedly designated several years after his membership with Lloyd's had ended in 1993 to accept service of process on Sundlun's behalf. Sundlun responded by promptly informing AUA9 of his previous resignation from Lloyd's and by explaining that he did not understand how he faced any liability. Contrary to Lloyd's allegations, the letter from AUA9 failed to enclose any Writ of Summons or form for Acknowledgement of Service, nor did Sundlun receive or acknowledge receipt of such documents from AUA9 or from anyone else. On July 25, 1997, Sundlun wrote to AUA9, informed AUA9 that he had not received a copy of the Writ of Summons, asked for further details underlying the basis of Lloyd's lawsuit against him, and requested the name of Lloyd's counsel. He received a reply to this letter on August 28, 1997. In the letter, AUA9 finally identified Dibb Lupton Alsop as counsel for Lloyd's. It still failed, however, to provide a copy of the Writ of Summons. With no copy of the Writ of Summons or timely notice of the claims against him before the default judgment entered, Sundlun had no meaningful opportunity to defend himself against Lloyd's claims.

## II. **<u>ARGUMENT</u>**

This Court should decline to enforce the English judgment against Sundlun because service of process on AUA9 constituted insufficient service of process on Sundlun, and Lloyd's

provided untimely and inadequate notice to Sundlun of the English lawsuit against him. Because Lloyd's failed to properly serve Sundlun with process, the English court lacked personal jurisdiction over him. For this reason alone, this Court should refuse to enforce the English default judgment.

"Two requirements must be satisfied before a court may exercise jurisdiction over a particular person." 16 Moore's Federal Practice, § 108.01[2] (Matthew Bender 3d ed.). First, a jurisdictional basis must exist; that is, "there must be a proper connection between the person … and the … sovereign's territory." Id. Second, to invoke jurisdiction, service of process must be made "in accordance with statutory and due process requirements." Id. Therefore, "even if a proper jurisdictional basis exists, service of process that does not meet due process and statutory requirements will vitiate jurisdiction." Id.

Courts refuse to recognize foreign judgments when the rendering court lacked personal jurisdiction over the defendant. "A court in the United States may not recognize a judgment of the court of a foreign state if … the court that rendered the judgment did not have jurisdiction over the defendant in accordance with the law of the rendering state" or with international concepts of jurisdiction. Restatement (Third) of Foreign Relations Law § 482(1)(b), cmt. c. See also Lamarque v. Fairbanks Capital Corp., 927 A.2d 753, 760 (R.I. 2007) (stating that "a judgment issued without proper personal jurisdiction over an absent party is not entitled to full faith and credit elsewhere").

Likewise, a United States court will not recognize a foreign judgment when the plaintiff failed to serve the defendant with process or provide him with reasonable notice of the lawsuit in sufficient time to enable him to defend himself. Thus, a United States court "need not recognize a judgment of the court of a foreign state if … the defendant did not receive notice of the

proceedings in sufficient time to enable him to defend." Restatement (Third) of Foreign Relations Law at § 482(2)(b). See also 16 Moore's Federal Practice, § 108.93 (Matthew Bender 3d ed.) (stating that "notice must be given sufficiently in advance to enable the defendant to properly prepare a defensive pleading"). Underlying this rule is the policy that "[t]he right to be heard before one's interests are adjudicated is a fundamental principle of fairness." Restatement (Second) of Judgments § 2 at cmt. A. Notice is adequate only if:

> (a) The notice is official in tenor, and states that the action is pending or about to be commenced and that there is opportunity to be heard concerning it and affords a reasonable time in which that opportunity may be exercised; and
> (b) The notice is transmitted in a manner that actually notifies the person being addressed or someone who can adequately represent him, or has a reasonable certainty of resulting in such notice; and
> (c) The form of the notice and the method employed for transmitting it sufficiently comply with the procedure prescribed for giving notice.

Id. at § 2(1)(a)-(c) (emphasis added). See also Lamarque, 927 A.2d at 761 (noting, in the context of a class action, that minimal due process requires: "notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel"; the "best practicable" notice, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"; and notice that "describe[s] the action and the plaintiffs' rights in it"). "[N]otice ordinarily consists of [a] summons with a copy of the complaint, which together warn of the action, and describe where it is pending and what it is about, and state that a default may be entered if no appearance is made." Restatement (Second) of Judgments at § 2 at cmt. b. Furthermore, notice is inadequate when it does not "indicate the kind and magnitude of the relief sought." Id.

These principles requiring actual and timely notice of the lawsuit from a court having personal jurisdiction over the defendant take on added significance in the context of a foreign

default judgment. "[S]ince a judgment rendered by a court not having jurisdiction over the judgment debtor is not entitled to recognition …, a court in the recognizing state will scrutinize the jurisdiction of the rendering court when that issue has not been adjudicated or waived in the rendering forum." Restatement (Third) of Foreign Relations Law § 481 at cmt. i. Here, since the English court did not adjudicate the issue of personal jurisdiction, this Court should pay particular attention to it.

**A. Service of process upon AUA9 constituted insufficient service of process on Sundlun.**

**1. The General Undertaking Agreement did not provide Lloyd's with authority to serve process on Sundlun via service on AUA9.**

It is undisputed that Sundlun had resigned from membership with Lloyd's by January 1, 1993. (Even Lloyd's admits that "Sundlun continued to be a member of Lloyd's until his termination on January 1, 1993." See Plaintiff's Settlement Conference Statement, filed September 26, 2007, at 2.) Significantly, nothing in the General Undertaking Agreement authorized Lloyd's to appoint one or more agents to enter into contracts or to accept service of process on Sundlun's behalf after the relationship between them had ended as of January 1, 1993, and nothing in that 1987 agreement authorized Lloyd's to enact byelaws that would bind Sundlun after the relationship had ended. Thus, Lloyd's reliance on having served AUA9 – an entity that Lloyd's or Equitas purportedly appointed as Sundlun's agent – after Lloyd's agreement with Sundlun had ended and without obtaining Sundlun's agreement or authorization for same – is wholly unjustified and illegal and cannot possibly serve as the basis for serving Sundlun with legal process, let alone holding him liable on the merits.

Lloyd's contends that the General Undertaking Agreement, the 1995 Reconstruction and Renewal Byelaw, the 1996 Resolution and Directions of the Council of Lloyd's, and the

Reinsurance Contract provided Lloyd's with the authority to appoint an agent for service of process on Sundlun's behalf. The 1995 Byelaw and the 1996 Resolution purport to allow AUA9 to enter into the Reinsurance Contract on the behalf of names such as Sundlun. The Reinsurance Contract, in turn, appointed an agent [AUA9] to accept service on behalf of the names. The General Undertaking Agreement, however, by its plain terms binds a member to legislation and directions only "[t]hroughout the period of his membership of Lloyd's." (General Undertaking Agreement at § 1) It likewise binds a member to enter into and abide by contracts only while he remains a member. Thus, the General Undertaking Agreement itself limited compliance with legislation and contracts relating to Lloyd's to the period of Sundlun's membership.[1] The 1995 Byelaw and the 1996 Resolution were enacted after Sundlun resigned in 1993, and therefore, do not bind him. Similarly, the Reinsurance Contract was not executed during "the period of his membership." Consequently, any attempt to serve process on Sundlun via AUA9 was ineffective. The Court, therefore, should conclude, as a matter of law, that Lloyd's service of process on AUA9 constituted inadequate service of process on Sundlun.

---

[1] Section 2.3 of the General Undertaking Agreement confirms that a member agrees to comply with byelaws only during the period of his membership. That section explicitly provides that the choice of law and jurisdiction provisions of the Agreement survive the termination of membership. (<u>See</u> General Undertaking Agreement at § 2.3) (stating that "[t]he choice of law and jurisdiction referred to in this Clause 2 shall continue in full force and effect in respect of any dispute and/or controversy of whatsoever nature arising out of or relating to any of the matters referred to in this Undertaking notwithstanding that the Member ceases, for any reason, to be a Member of, or to underwrite insurance business at, Lloyds")). This clause demonstrates that Lloyd's knew how to include language that would cause provisions of the contract to remain effective even after a name's membership had ended. But it failed to include such language with respect to compliance with the contractual provisions relating to byelaws, contracts, or to the appointment of agents for members.

The Court should also note that the Substitute Agents Byelaw of 1983, which allegedly allowed the Council of Lloyd's to appoint a specified person to act as an agent or sub-agent, was limited to "any underwriting member of the Society as to the whole or any part of that member's underwriting business." (Substitute Agents Byelaw at § 1, p.1) By its terms, however, this byelaw does not apply to <u>former</u> underwriting members who had ceased to engage in any underwriting business as a member of Lloyd's when the agent's appointment was purportedly made.

**2. Sundlun's membership terminated upon his resignation in January of 1993.**

A 1979 General Undertaking Agreement, which Sundlun allegedly signed, but upon which Lloyd's does not rely, demonstrates that membership ends when the name resigns. Section 2 of that agreement begins: "[f]or as long as I am a Member of Lloyd's and thereafter until all the accounts of any underwriting business entered into by me or on my behalf shall have been fully wound up … and all claims and liabilities by or against me … arising out of or in connection with such membership or underwriting shall have been discharged or provided for …" (emphasis added). According to the 1979 General Undertaking Agreement, therefore, the winding up of liabilities and discharge of claims consist of post-membership activities that occur after resignation. Membership is not elongated past resignation to encompass the wind-up period, and certainly not to allow for the execution of new contracts or the appointment of agents for service of process.

To bolster its argument that Sundlun is bound by legislation enacted and contracts entered into after his resignation, Lloyd's relies on a form that Sundlun allegedly signed in connection with his resignation. That form supposedly states[2]:

> I hereby confirm that I wish to resign from membership of the Society of Lloyd's … such resignation to take effect at the year end following the time as from which insurance to close in respect of every year of account of every syndicate of which I am a member has taken effect or at such other date as the Council/Committee of Lloyd's may in its absolute discretion determine.

(Emphasis added.) Lloyd's reliance on this resignation form fails for two reasons.

First, the form constitutes an unenforceable adhesion contract. Adhesion contracts are "formed with the use of standard form documents," and when "[t]he party that prepared the

[2] The form is illegible; this is Lloyd's version of what the form supposedly says.

contracts … approaches the potential contractual relationship with a take-it-or-leave-it posture." Kristian v. Comcast Corp., 446 F.3d 25, 32 at n.2 (1st Cir. 2006). "Usually there is no true equality of bargaining power between the parties." J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc., 365 F.Supp.2d 119, 142 (D. Mass. 2005). Other indicia of adhesion contracts include:

> the form has been drafted by, or on behalf of, one party to the transaction; … the drafting party participates in numerous transactions of the type represented by the form and enters into these transactions as a matter of routine; … the form is presented to the adhering party with the representation that, except perhaps for a few identified items, the drafting party will enter into the transaction only on the terms contained in the document (this representation may be explicit or may be implicit in the situation, but it is understood by the adherent); and … the adhering party enters into few transactions of the type represented by the form – few, at least, in comparison with the drafting party.

Id.

Here, the resignation form is a standard form document that Lloyd's drafted and utilized for names who wished to resign. Sundlun had to sign this form in order to resign, and was not allowed to make any changes to the document. Furthermore, there was no true equality of bargaining power between Sundlun and Lloyd's. Sundlun, an individual, was already a member of Lloyd's and wanted to resign. Lloyd's, on the other hand, is a British insurance market, which knew that Sundlun, like many names at the time, would desire to resign. Although this was the only transaction of this type that Sundlun entered into, Lloyd's repeatedly utilized this form.

Adhesion contracts are unenforceable when they are "unconscionable, offend public policy, or are shown to be unfair in the particular circumstances." Chase Commercial Corp. v. Owen, 588 N.E.2d 705, 708 (Mass. App. Ct. 1992); Bull HN Info. Systems, Inc. v. Hutson, 229 F.3d 321, 331 (1st Cir. 2000). A contract is unconscionable when there is: "an absence of

'meaningful choice' on the part of one of the parties" and "the challenged contract terms are 'unreasonably favorable' to the other party." E.H. Ashley & Co., Inc. v. Wells Fargo Alarm Services, 907 F.2d 1274, 1278 (1st Cir. 1990); 7 Corbin on Contracts § 29.4 (Rev. ed. 2002); 8 Williston on Contracts § 18:9 (4th ed. 1998). The "indicia of unconscionability include disproportionate bargaining power, non-availability of alternatives, and [an] illegal, oppressive, or unreasonable contract." E. H. Ashley & Co., Inc., 907 F.2d at 1278. "Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party." Post v. Belmont Country Club, Inc., C.A. No. 976185, 2000 WL 33170784, at *4 (Mass. Super. Nov. 11, 2000). "If a contract or term thereof is unconscionable at the time the contract is made[,] a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result." Restatement (Second) of Contracts § 208.

In this case, the adhesion contract resignation form is unconscionable because Sundlun had no choice but to sign the document in order to resign, and the challenged contract terms are unreasonably favorable to Lloyd's. The form purports to extend Sundlun's membership with Lloyd's for as long as Lloyd's pleases. If reality were as Lloyd's argues, Lloyd's could, on this day, enter into a binding contract on Sundlun's behalf even though he resigned nearly 14 years ago. Moreover, the resignation form resulted in unfair surprise to Sundlun. The General Undertaking Agreement does not state that resignation from membership takes place only when Lloyd's deems fit or "at the year end following the time as from which insurance to close … has taken effect." Because the resignation form is an unconscionable adhesion contract, the Court should refuse to enforce it.

Second, even if the resignation form is deemed enforceable, and extends membership until insurance to close has taken effect, or even indefinitely, it does not purport to extend membership for the purpose of appointing agents to enter into reinsurance contracts or to accept service of process for lawsuits arising out of same. By its terms, the resignation form purportedly extends membership for the purpose only of winding up past liabilities, not entering into new ones.[3]

**3. The cases that Lloyd's cites regarding the appointment of AUA are inapposite.**

Lloyd's cites several cases in support of the proposition that AUA9 was duly appointed as Sundlun's agent for service of process, and that service on AUA9 constituted effective service of process on Sundlun. However, none of these cases address a situation in which AUA9 was appointed after the name resigned from membership. See Lloyd's v. Cohen, 108 Fed. Appx. 126, 127-28 (5th Cir. 2004) (unpublished opinion) (where name challenged service of process on AUA9 because he sent Lloyd's a letter advising that no one had authority to accept service of process on his behalf); Lloyd's v. Turner, 303 F.3d 325, 332 (5th Cir. 2002) (where name challenged foreign judgment on ground that breach of contract claim in England required proof of fewer elements than Texas law); Lloyd's v. Ashenden, 233 F.3d 473, 476-81 (7th Cir. 2000) (where names argued that the court should not enforce foreign judgments because they were "rendered under a system which does not provide impartial tribunals or procedures compatible with the requirements of due process of law"); Lloyd's v. Webb, 156 F.Supp.2d 632, 639 (N.D. Tex. 2001) (in which name claimed lack of due process because of the "pay now, sue later" and

[3] Lloyd's also relies on a letter from Sundlun's accountant, Ms. Horton, as support for its contention that membership ends only after all underwriting obligations are settled. The letter, however, not only does not confirm this allegation, but actually calls it into question. Ms. Horton writes: "Mr. Sundlun resigned as an underwriter as of December 31, 1992 and I was told that it would take three years for him to be completely out of the underwriting due to the time frame in which claims are settled. Is this first assumption correct?" (emphasis added).

"conclusive evidence" clauses in the Reinsurance Contract); Lloyd's v. Tropp, Case No. 2002/848, Gross, J. (Queen's Bench Division Jan. 20, 1994) (in which the name argued that service on AUA9 was inadequate, but did not advance any argument concerning resignation from membership); Lloyd's v. Leighs & Ors, Colman, J. (Queen's Bench Division Feb. 20, 1997) (holding that AUA9 was validly appointed as a substitute agent to enter into the Reinsurance Contract, but failing to address issue of resignation from membership).

**B. Service by other means did not afford Sundlun reasonable time and adequate notice to defend himself.**

Although Sundlun received a letter from AUA9 concerning the pending English lawsuit, he did so only at or about the same time (June 24, 1997) that the judgment in England entered against him. Neither Lloyd's nor AUA9 gave Sundlun notice of the lawsuit in reasonable time for him to defend himself. Such inadequate and late notice violated basic principles of due process.

Moreover, Sundlun failed to receive adequate notice of the lawsuit because he did not receive a copy of the legal documents setting forth Lloyd's claim prior to the entry of the default judgment against him. Thus, the notice he received was not only late and incomplete, it was not "official in tenor." Further, neither Lloyd's nor AUA9 otherwise informed Sundlun about the nature of the English action or the kind and magnitude of the relief that Lloyd's sought against him. In the context of a foreign default judgment, this Court must strictly apply the rules governing service of process.

## III. CONCLUSION

For the above reasons, the Court should dismiss Lloyd's complaint and enter judgment in Sundlun's favor.

## Exhibit List

Sundlun intends to utilize any or all of the following exhibits at trial:

| Exhibit | Description | Purpose |
| --- | --- | --- |
| **A** | January 1, 1979 General Undertaking Agreement | Duration of membership |
| **B** | January 1, 1987 General Undertaking Agreement | Service of process on AUA9 was ineffective |
| **C** | Lloyd's resignation form | Duration of membership |
| **D** | 1983 Substitute Agents Byelaw | Service of process on AUA9 was ineffective |
| **E** | January 13, 1994 letter from Debbi-Jo Horton to Murray Lawrence Members Agency Limited | Duration of membership |
| **F** | 1995 Reconstruction and Renewal Byelaw | Service of process on AUA9 was ineffective |
| **G** | 1996 Resolution and Directions | Service of process on AUA9 was ineffective |
| **H** | 1996 Reinsurance and Run-Off Contract | Service of process on AUA9 was ineffective |
| **I** | 1996 Summary of Lloyd's Syndicate Income and Expenses and Explanatory Notes | Valuation of Lloyd's claim |
| **J** | March 1996 Indicative Finality Statement and Explanatory Notes | Valuation of Lloyd's claim |
| **K** | March 22, 1996 letter from Lloyd's to Sundlun regarding withdrawal from Central Fund | Valuation of Lloyd's claim |
| **L** | May 20, 1996 letter from Norwell to Sundlun regarding withdrawal from Central Fund | Valuation of Lloyd's claim |
| **M** | June 25, 1996 letter from Sundlun to Norwell regarding withdrawal from Central Fund | Valuation of Lloyd's claim |
| **N** | May 28, 1997 letter from AUA9 to Sundlun regarding lawsuit | Insufficient notice |
| **O** | June 24, 1997 letter from Sundlun to Dibb Lupton Alsop regarding his resignation | Insufficient notice |

| | | |
|---|---|---|
| **P** | June 24, 1997 letter from Sundlun to AUA9 regarding his resignation | Insufficient notice |
| **Q** | July 25, 1997 letter from Sundlun to AUA9 regarding writ | Insufficient notice |
| **R** | August 28, 1997 letter from AUA9 to Sundlun providing name of lawyers | Insufficient notice |
| **S** | October 12, 1998 Non Accepting Member's Finality Account | Valuation of Lloyd's claim |
| **T** | December 16, 1998 Finality Account | Valuation of Lloyd's claim |
| **U** | February 27, 2002 letter from Lloyd's to Sundlun regarding notice of change of solicitor | Service of process on AUA9 was ineffective |
| **V** | Lloyd's Complaint | Duration of membership |
| **W** | Lloyd's Premiums Trust Deed | Valuation of Lloyd's claim |
| **X** | Letter of Credit | Valuation of Lloyd's claim |
| **Y** | Schedule detailing Name's Premium | Valuation of Lloyd's claim |
| **Z** | September 26, 2007 Lloyd's Settlement Conference Statement | Duration of membership |

## List of Witnesses and Subjects of Testimony

Sundlun will testify concerning the terms of his membership with Lloyd's, the duration of his membership with Lloyd's, and the inadequate and untimely notice of the English lawsuit.

## Probable Length of Trial

Sundlun's counsel believes the trial will occupy approximately one-half day.

BRUCE SUNDLUN

By his Attorneys,

/s/ Robert G. Flanders, Jr.
Robert G. Flanders, Jr. (#1049)
Anna M. Piazza (#7206)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
(401) 274-2000
(401) 277-9600 (fax)
rflanders@haslaw.com
apiazza@haslaw.com

Dated: September 28, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2007, a copy of the foregoing Pre-Trial Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Robert G. Flanders, Jr.
Robert G. Flanders, Jr. (#1785)
Anna M. Piazza (#7206)
Hinckley, Allen & Snyder LLP
50 Kennedy Plaza, Suite 1500
Providence, RI 02903
Phone: (401) 274-2000
Fax: (401) 277-9600
rflanders@haslaw.com
apiazza@haslaw.com

828523 (47702-127777)